# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### September 9, 2008 Session

## STATE OF TENNESSEE v. DAVID LYNN JORDAN

**Direct Appeal from the Circuit Court for Madison County**
**No. 05-431    Roy B. Morgan, Jr., Judge**

---

**No. W2007-01272-CCA-R3-DD   -   Filed June 9, 2009**

---

A Madison County jury convicted the defendant, David Lynn Jordan, of three counts of first degree premeditated murder, two counts of first degree felony murder, two counts of attempted first degree murder, two counts of aggravated assault, and one count of leaving the scene of an accident.  The trial court merged the felony murder convictions with the premeditated murder convictions involving the same victims and the aggravated assault convictions with the attempted murder convictions.  For the three first degree murder convictions, the defendant was sentenced to death.  Additionally, he was sentenced as a Range I, standard offender to consecutive terms of twenty-five years for each of the attempted first degree murder convictions, six years for each of the aggravated assault convictions, and thirty days for leaving the scene of an accident.  The defendant now seeks review by this court of both his convictions and resulting sentences of death, presenting the following issues for review:  (1) whether the trial court erred by failing to provide a limiting instruction regarding the use of hearsay statements during the testimony of the State's expert witness; (2) whether the defendant was denied a fair trial by the use of interpretations of his confession and alleged comments which were not videotaped; (3) whether the trial court erred by prohibiting members of the defendant's family from remaining in the courtroom during the penalty phase; (4) whether the prosecutorial misconduct during the penalty phase denied the defendant a fair trial; (5) whether the trial court erred in admitting certain victim impact testimony; (6) whether the jury instruction on the felony murder aggravating factor is unconstitutional; (7) whether the trial court erred in admitting certain photographs during the penalty phase; (8) whether the evidence was sufficient to support the application of aggravating factors; (9) whether Tennessee's death penalty statutes are constitutional; (10) whether cumulative error requires relief; and (11) whether the death sentence in this case is disproportionate to death sentences in other cases.  Following review, we affirm the defendant's convictions and the sentences of death.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which NORMA MCGEE OGLE and CAMILLE R. MCMULLEN, JJ., joined.

George Morton Googe, District Public Defender, Jackson, Tennessee, and Lloyd Tatum, Henderson, Tennessee, for the appellant, David Lynn Jordan.

Robert E. Cooper, Jr., Attorney General and Reporter; James E. Gaylord, Assistant Attorney General; James G. Woodall, District Attorney General; and Jody Pickens, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## FACTS

The defendant's convictions arose from a shooting incident on January 11, 2005, at the Tennessee Department of Transportation (TDOT) facility in Jackson, where the defendant killed three people: Renee Jordan, his thirty-one-year-old wife who was employed at TDOT; Jerry Hopper, an employee of the Tennessee Division of Forestry who was at the TDOT office; and David Gordon, a motorist he ran off the road en route to the TDOT garage. The defendant also shot and injured two other TDOT employees, James Goff and Larry Taylor.

### State's Proof

Kenneth Evans, Renee Jordan's cousin, testified that he was aware that the defendant and Mrs. Jordan were having martial problems and, on January 10, 2005, Mrs. Jordan called and told him that "she was about to have a nervous breakdown, and she was scared of [the defendant], that he was calling threatening her." Mrs. Jordan told Evans that the defendant "was on his way out to the house and that he said . . . it didn't matter how many lawyers she had and how much money she had, that what he had for her wasn't going to do her any good." Evans advised Mrs. Jordan to leave the house and go to the police department, but she refused to do so, saying that the defendant had "had run-ins with the police department before. He would shoot me there whether the police was there or not, and he would probably shoot them, too." Evans then told her to come to his house, which she did. After she arrived, they took Mrs. Jordan's three-year-old daughter to Mrs. Jordan's mother's house. Evans later hid Mrs. Jordan's car at a friend's house, and they returned to Evans' home around 10:30 p.m.

The following morning, January 11, 2005, Mrs. Jordan and Evans, also a TDOT employee, went to work. Mrs. Jordan worked in the office of the TDOT garage, which was commonly referred to as "the crow's nest." That morning, Evans was in the "crow's nest" with Mrs. Jordan until approximately 11:10 a.m., when he left to go pick up some parts. Ricky Simpson and James Goff were in the office with Mrs. Jordan when he left.

Johnny Emerson testified that he was employed as a mechanic at the TDOT garage where Mrs. Jordan worked. Emerson said that he and Mrs. Jordan were close friends and that their relationship had developed beyond a co-worker relationship. Physically, their relationship was limited to hugging and kissing. Mrs. Jordan told Emerson that she was getting a divorce. On one occasion, the defendant telephoned Emerson at home regarding his relationship with Mrs. Jordan. The defendant told Emerson that he was "too old" for Mrs. Jordan and that he "needed [his] ass whooped." Emerson agreed with the defendant that he "didn't have no business doing

what [he] did." The defendant also contacted Emerson's wife on numerous occasions. At some point prior to January 11, 2005, Emerson informed Mrs. Jordan that he was not going to divorce his wife. Emerson said he was not at work on January 11, 2005, because he was on medical leave.

Linda Sesson Taylor, an attorney in Jackson, testified that Mrs. Jordan hired her on December 14, 2004, to represent her in divorce proceedings against the defendant. She said she initially prepared the necessary documents for a contested divorce, and Mrs. Jordan told her she would have the money to pay her fee after the Christmas holiday. Ms. Taylor said she also prepared the paperwork to obtain a restraining order against the defendant, and Mrs. Jordan had an appointment scheduled for January 12, 2005.[1] Ms. Taylor identified a page out of her phone message book indicating that Mrs. Jordan had called her office on January 11, 2005, at 9:56 a.m. wanting to know how much Ms. Taylor charged for an uncontested divorce.

Kevin Deberry, the next-door neighbor of the defendant and Mrs. Jordan, testified that Mrs. Jordan called him on the night of January 10, 2005, and was upset with the defendant. About an hour later, the defendant came to Deberry's house and asked Deberry to take Mrs. Jordan's dog to their house and get his house key, but Deberry refused to do so. The defendant then told Deberry if he did not take Mrs. Jordan's dog to her, he "was gonna take it over there and shoot it in the driveway." As the defendant turned to walk away, Deberry noticed what he believed to be a "snub-nose .38" in the defendant's back pocket. The defendant then turned around and told Deberry that he "better watch [his] back, you never kn[o]w which way the bullets are gonna fly." Deberry called Mrs. Jordan and told her to take her child and leave the house because the defendant was on his way over there. Mrs. Jordan told Deberry that the defendant had left some threatening voicemails on her phone. The defendant later called Deberry and apologized. Deberry said that he took a half-gallon bottle of vodka to the defendant's house at about 1:00 a.m. and that the defendant and his children were still up when he arrived.

Investigator Jeff Shepherd of the Jackson Police Department testified that, as part of his investigation, he retrieved and recorded voicemail messages left on Mrs. Jordan's cell phone. The audiotape of the messages was entered into evidence and played for the jury. Additionally, Investigator Shepherd was involved in the booking process of the defendant, during which the defendant asked him if Mrs. Jordan was "real bad messed up." The defendant started crying and told Shepherd that most people probably thought he was crazy, but he was not crazy, he was "driven to crazy." The defendant also said that the assault rifle he used in the shooting belonged to his brother-in-law, Dale Robinson.

Vernon L. Stockton, Sr. testified that on January 11, 2005, he was employed as an equipment mechanic at the TDOT garage which was located in the same building as the crow's nest where Mrs. Jordan worked. He said he knew that Mrs. Jordan and the defendant were

---

[1]On direct examination, Ms. Taylor testified that Mrs. Jordan's appointment was scheduled for January 11, 2005, but, on cross-examination, after reviewing her statement, she agreed that the date was January 12.

having marital problems. Between 9:30 and 10:00 a.m. on the morning of January 11, Mrs. Jordan handed Stockton her portable phone when it rang and asked him to answer it. Stockton recognized the caller's voice as that of the defendant. The defendant asked to speak to Mrs. Jordan, but Stockton told him that she was in the restroom because she did not want to talk to him. Stockton said he later left TDOT to pick up some parts and was not present when the shooting occurred.

Sonny Grimm testified that he and Paul Forsythe were driving westbound on Lower Brownsville Road on January 11, 2005, and a green car was traveling in front of them. As they approached Angus Lane, Grimm saw the defendant, who was driving a red pickup truck, run a stop sign and strike the green car, knocking it off the road. Grimm wrote down the license plate number of the defendant's vehicle and said the defendant continued traveling toward the TDOT garage. Grimm, Forsythe, and the driver of the green car followed the defendant to the garage where Grimm saw people running everywhere. Forsythe gave the driver of the green car the license plate number of the red pickup truck. The defendant came out of the garage and told the driver of the green car to leave, but he refused to do so. The defendant then reached inside his truck, pulled out a rifle, and shot the driver.

Walter Paul Forsythe testified that he and Grimm left their place of employment around 9:30 a.m. on January 11, 2005, to go to HCI on Lower Brownsville Road to purchase some starter fluid for their backhoe. They were traveling west on Lower Brownsville Road behind a green car when they saw a red Mazda pickup truck come down Anglin Lane, run a stop sign, and strike the green car, knocking it off the road. Forsythe followed the truck to get its license plate number for the driver of the green car. Because he was driving, Forsythe called out the license number to Grimm who wrote it down. The pickup truck then ran a four-way stop and turned into the main entrance of TDOT. Forsythe called 911 and pulled into the TDOT parking lot. The green car then pulled up, and Forsythe gave the driver, David Gordon, the tag number of the pickup truck. As Gordon was walking back to his car, the defendant came out of the TDOT building and told Gordon to leave, but he refused to do so. The defendant then reached inside his truck and pulled out a long gun. Gordon threw his hands up in the air and told the defendant, "Please don't shoot. Wait a minute." However, the defendant started shooting, and Forsythe and Grimm fled the scene.

Randy Joe Perry, a TDOT employee, testified that on January 11, 2005, the defendant came to the TDOT garage and pushed Perry out of his way as he approached the steps leading up to the crow's nest where Mrs. Jordan worked. David Pickard, another TDOT employee who was standing near Perry, said, "Who was that son-of-a-bitch?" The defendant, who had his right hand in his coat pocket, turned around and gave Perry and Pickard a "hard look" before going upstairs to the crow's nest. Perry then heard three or four gunshots and saw the defendant pointing a gun at Jerry Hopper who was sitting in a chair. Perry heard another gunshot and saw Hopper slump over. Hearing more gunshots, Perry ran outside the building and got behind his truck. Shortly thereafter, the defendant calmly walked outside to his vehicle. Perry next noticed a man get out of another vehicle and walk toward the defendant. The defendant reached inside his truck and

retrieved a rifle. The man who had been walking toward the defendant stopped and raised his hands. A few seconds later, the defendant fired several shots at the man and then got in his truck and drove toward the front gate.

David Thomas Pickard testified that he was standing near the stairs with Randy Perry and other employees when the defendant came in the garage and shoved him and Perry backwards as he walked past the group of men. Pickard responded by saying, "Who does that crazy son-of-a-bitch think he is?" The defendant, who smelled of alcohol, turned around and got in Pickard's face "like he wanted to whoop [him]." The defendant then proceeded upstairs to the crow's nest where Mrs. Jordan was facing the window. Pickard saw the defendant shoot Mrs. Jordan and described the shooting, "The first time it went 'Pow' and she went like this and come back and he went 'Pow, Pow, Pow', like that." Pickard ran out of the garage to his office located across from the garage. After instructing the employees in his office to lock the door, Pickard went back outside and saw the defendant, pistol in hand, exit the garage and go to his truck and retrieve a rifle. Pickard went back inside the office and, a few minutes later, saw the defendant leave in his truck. Pickard then went to the crow's nest where he saw Mrs. Jordan and Jerry Hopper lying on the floor. He said he looked at Mrs. Jordan and knew she was dead, but Hopper was still alive and a man was trying to resuscitate him. Outside in the parking lot, Pickard saw another man lying on the ground. He said the man was not dead at that time, but he "was turning real yellow-looking and blood was everywhere."

James Goff testified that he was in the crow's nest with Mrs. Jordan, Larry Taylor, and Jerry Hopper when the defendant came in, raised his shirt, and pulled out what appeared to be a nine-millimeter pistol. Mrs. Jordan had her back to the door, and the defendant called out her name. Mrs. Jordan turned around, and the defendant started shooting. The defendant shot Mrs. Jordan in the chest and fired additional shots, including what appeared to be a shot to the forehead. The defendant then shot Hopper. Taylor dove under a desk, and the defendant shot Goff in the leg, the right side of the neck, the arm, and the stomach. Although he did not see Taylor being shot, Goff heard two more shots and heard Taylor grunt. As the defendant was leaving the crow's nest, Goff heard him mutter, "I love you, Renee."

After the defendant left the room, Goff got up and asked Taylor about his condition. He saw Hopper lying on the floor "in bad shape" and Mrs. Jordan was dead. Goff was then able to make his way to the main office for help. He said he was hospitalized for three days as a result of his injuries.

Larry Taylor testified that he was ending a telephone call inside the crow's nest when the defendant entered the room, stood there "for a moment or so," pulled his coat back, and brandished a weapon. The defendant then called Mrs. Jordan by name and, when she turned to face him, shot her. She fell back in a chair, and the defendant fired two additional shots, with the third one striking her in the head. Mrs. Jordan fell to the floor, and Taylor could tell that she was dead. Taylor dove under a desk for protection, heard more gunshots, and saw Goff fall. He then heard more gunshots and felt pain in his legs. Taylor heard the door close, and Goff asked him if

he was all right before leaving the room. Taylor then got up and saw Hopper on the floor on his knees with his face in his hands and saw Mrs. Jordan on the floor with her face in a pool of blood. He called 911 and was trying to assist Hopper when he heard the door open and saw the defendant with "a rifle-type gun." Taylor looked the defendant "square in the eye" and stood back up, holding both his hands in front of him. He asked the defendant if he could leave, and, after a brief pause, the defendant said, "Yeah, you can go out now." After Taylor got downstairs, he heard gunshots in rapid succession and hurriedly went out the door. He saw Goff, who was "kind of delirious" and holding a towel to his neck, and told another employee, Alvin Harris, to drive Goff to the hospital in the parts truck. Taylor then got in his car and drove himself to the hospital where he was treated for the gunshot wounds to his legs.

Freddie Ellison, a reserve deputy and a mechanic at TDOT, testified that when he returned to the garage from his lunch break around 11:30 a.m., people were running out of the garage. He then observed the defendant, whom he had known for approximately twenty years, walk out the roll-up doors of the garage with two semiautomatic handguns underneath his shirt. The defendant raised his shirt and had his hand on one of the pistols. Ellison asked the defendant what he was doing, and the defendant told him to "[b]ack off." Ellison retreated to the back of the building where he observed David Gordon pull up in a green car. Gordon announced that "[t]he guy in the red pickup truck has run over me," and Ellison advised Gordon to "back off" because the defendant had a gun. Gordon refused, stating that he had the police on the way. Ellison then heard "automatic" gunfire and called the Madison County Sheriff's Department for assistance. He and Willie Martin left TDOT and went "out to 223." He saw the defendant leave in his red pickup truck, headed toward Jackson.

Shortly thereafter, Ellison observed an unmarked police unit and advised dispatch to instruct the unit to follow the defendant. Ellison then returned to the TDOT garage and saw David Gordon on the ground. Gordon had been shot multiple times. Inside the crow's nest, Ellison discovered "blood all over the floor" and saw Mrs. Jordan lying on the floor with multiple gunshot wounds. He described Mrs. Jordan as being "shot all to pieces," including being shot in the forehead. Jerry Hopper had been shot several times in the chest.

Alvin Harris, a store clerk at TDOT, testified that he heard gunshots and went to the garage where he encountered Goff who was holding his throat and bleeding. He also saw Taylor who was "real panicky" and pointed to his legs when Harris asked him if he was hurt. Taylor told Harris that the defendant had shot Mrs. Jordan and that she was "gone." Because Goff was losing a lot of blood and Harris feared death was imminent, Harris decided to drive Goff to the hospital rather than wait for the ambulance.

Darrell Vaulx, a TDOT mechanic, testified that as he was leaving the shop on January 11, 2005, he saw the defendant, Mrs. Jordan, Hopper, and Taylor through the glass window in the crow's nest. The defendant pointed a gun at Mrs. Jordan, and she fell. Vaulx heard two more gunshots and saw the defendant turn toward the men in the crow's nest. Vaulx said he and other employees ran outside to the parking lot where Vaulx saw the defendant's red Mazda pickup

truck. Vaulx then saw the defendant come outside and calmly walk to his truck. Thinking that the defendant was leaving, Vaulx ran inside to the crow's nest where he found Mrs. Jordan on the floor with three gunshot wounds to the head. Someone yelled, "He's coming back," and Vaulx ran back outside to the parking lot and noticed that the defendant's truck was still there. He then heard a noise that sounded like an airgun or a rifle. After someone said the defendant was getting in his truck and leaving, Vaulx went back inside and found Hopper who was "breathing just a little bit" and "squirming" like he was in pain. Vaulx administered CPR to Hopper until the paramedics arrived.

George Washington Bond, a TDOT employee who worked in the car wash room in the garage, testified that he heard "three pops," looked out the window in the garage door, and saw the defendant standing over "the victim." The defendant then looked at Bond and shook his head, which Bond interpreted to mean "[d]on't get involved." Bond saw what appeared to be the grip of a gun in the defendant's hand. The defendant then came inside the garage and went to the crow's nest. Bond saw the defendant pointing a long gun where Mrs. Jordan sat. Bond then ran to another building and did not return to the garage. On cross-examination, Bond acknowledged that he did not see the defendant shoot "the victim."

Barbara Surratt, Mrs. Jordan's former mother-in-law, testified that, even after Mrs. Jordan and her son divorced, she remained close with Mrs. Jordan. During the first part of 2005, Mrs. Jordan was staying with Surratt at her home on Old Pinson Road. On January 11, 2005, at approximately 1:30 a.m., Surratt received a telephone call from the defendant. The defendant told her that he knew Mrs. Jordan was not there and asked her to tell Mrs. Jordan "happy birthday" the next time she saw her. Surratt stated that Mrs. Jordan's birthday was not until February. Around 11:30 a.m., Surratt telephoned Mrs. Jordan at work and, during their conversation, heard an "ungodly racket, loud noises" and a sound like "a chair go across the room." She screamed Mrs. Jordan's name, but she did not answer. Surratt then heard the defendant say, "Renee. Renee. I hate you."

Jackson Police Sergeant Mike Thomas testified that he was on patrol in an unmarked cruiser on Vann Drive when he received a call about the shooting at the TDOT garage. En route to the scene, Sergeant Thomas was advised that the suspect had a machine gun. Before reaching the TDOT garage, he observed a red Mazda pickup truck matching the description of the suspect's vehicle and began pursuit of the truck. The truck ran a stop sign. Shortly thereafter, a marked patrol unit, driven by Sergeant Sain, passed the truck on Anglin Lane. Sergeant Sain turned his cruiser around and joined the pursuit. Another unmarked unit, driven by Captain Priddy, joined the pursuit as well. The suspect's vehicle forced Captain Priddy's vehicle off the road. Officer Maxwell placed his patrol cruiser in position to do a partial roadblock. The suspect's vehicle hit Officer Maxwell's car, and Sergeant Thomas pulled in behind it to block it from leaving. The suspect, identified as the defendant, was taken into custody. A search of the defendant's person revealed a loaded .45 caliber pistol and a loaded nine-millimeter pistol. Inside the defendant's truck, the officers discovered a rifle and a shotgun.

Officer Ted Maxwell of the Jackson Police Department testified that he responded to a call concerning the shooting at the TDOT garage. En route to the scene, he encountered the defendant, driving a red pickup truck, followed by two police units. Officer Maxwell said he was traveling north on Anglin Lane, and the defendant was traveling south. Ultimately, Maxwell managed to stop the defendant by ramming the front of his vehicle. The defendant got out of his vehicle, and Maxwell noticed a gun in the small of his back under his belt. Sergeants Sain and Thomas placed the defendant on the ground and removed two handguns from him that were identified as an Intra Arm Star .45-caliber semi-automatic with a clip containing six live rounds and one live round inside the chamber and an Intra Arm Star nine-millimeter semi-automatic with a clip containing two live rounds and one live round in the chamber. Maxwell said that eight .45-caliber and nineteen nine-millimeter rounds were recovered from the defendant's pockets.

Tennessee Highway Patrol Sergeant Johnny Briley testified that he initially received a call regarding a hit-and-run accident on Lower Brownsville Road at Anglin Lane involving a red Mazda pickup truck. While proceeding to that location, he received another call about the shooting at the TDOT garage. He received information that there were multiple victims involved. Before he reached the TDOT garage, he observed that the suspect vehicle had been pulled over by Jackson police officers. He stopped at the scene. Sergeant Briley said that he had known Mrs. Jordan and her family for thirty years and also knew the defendant. As the defendant stood up, he told Sergeant Briley, "She fucked me over, Johnny." Sergeant Briley responded, "No, she didn't, David." Sergeant Briley, who was standing within a foot of the defendant, detected an odor of alcohol on the defendant's person. The defendant was subsequently placed in the backseat of a police car.

Jackson Police Officer Rodney Anderson testified that en route to the scene of the shooting, he received another call that the suspect was headed down Anglin Lane. Officer Anderson turned onto Anglin Lane where he observed a vehicle matching the description of the suspect's vehicle between two patrol cars. The driver of the vehicle, the defendant, was taken into custody and placed in the backseat of Officer Greer's marked police unit. As Officers Greer and Anderson were transporting the defendant to the Criminal Justice Complex, the defendant told them that:

> he could have cut the police in half with his weapon, that he had full auto. He stated this[,] his wife's dead and she's full of holes. He stated she drove him crazy . . . by fucking around on him, and he advised that he shot her with her brother's gun. He also stated that he feels sorry for his daughters, and that Mrs. Jordan wouldn't be fucking around on anybody else.

The defendant said that the other people "just got in the way" and asked how many people were hurt. The defendant also said that his wife "hurt him and tore his heart out" and that he had been "going crazy" for a month. Officer Anderson said that the defendant smelled of alcohol.

Trent Harris, a paramedic at Jackson-Madison County General Hospital, testified that he and Corey Shumate, an emergency medical technician, responded to the scene at the TDOT garage, arriving at 11:39 a.m. They first attended David Gordon who was lying on his back in the parking lot and appeared to have gunshot wounds to the upper right and upper left portion of his abdomen. Gordon was not breathing but had a faint pulse. Harris intubated Gordon and immediately began transportation to the hospital. En route, Gordon lost a pulse and CPR was initiated. Upon their arrival at the hospital, Gordon's care was transferred to the hospital's trauma team.

Eric Leath, a paramedic with the Medical Center EMS, testified that he was also dispatched to the TDOT garage. Upon his arrival, he was directed inside to an office where he observed a man lying on the floor on his back and a woman lying inside the door to the left. The woman had "a massive . . . injury to her head that had blood tissue lying all around, pooled around her head" and had no signs of life. The other victim, Jerry Hopper, was very pale and had "some gasping or . . . agonar, gasping-type breaths, just very shallow, slow." Hopper had a faint carotid pulse. Leath inserted a breathing tube, but Hopper was unresponsive. A Jackson police officer offered assistance to Leath and began CPR. Hopper was then moved to an ambulance and transported to the hospital. Upon arrival at the hospital, Hopper exhibited no signs of life.

Dr. David James testified that he treated Larry Taylor at the Jackson-Madison County General Hospital. Taylor had suffered gunshot wounds to both of his legs. Dr. James also treated Jerry Hopper who had two gunshot wounds to his abdomen. Upon Hopper's arrival at the hospital, he was not breathing and all attempts at resuscitation were unsuccessful. Hopper was pronounced dead at 12:34 p.m.

Dr. Tony R. Emison, the medical examiner and coroner for Madison County, testified that he requested autopsies on the bodies of the three deceased victims. The bodies were sent to the state medical examiner's office in Nashville.

Dr. Staci Turner testified that she performed the autopsy on Mrs. Jordan at the medical examiner's office in Nashville. Dr. Turner found that Mrs. Jordan had sustained eleven gunshot wounds to the head, torso, and right leg. Dr. Turner found injuries to the scalp, the skull, the bones of the face, the brain, multiple ribs, the right lung, the diaphragm, the liver, the right kidney, the stomach, the small intestine, the urinary bladder, and the uterus. Dr. Turner recovered multiple bullets, bullet jackets, bullet cores and white plastic disk fragments during the autopsy. One gunshot wound to the head was fired from within a foot of the body.

Dr. Turner discovered a visible bullet in a partial exit wound in the back of Mrs. Jordan's head. She recovered the bullet and the jacket that had separated from the bullet. The bullet was identified as a Black Talon-type bullet, one fired from a handgun. She described the bullet as having a bullet core and a jacket, "and when it enters the body, the jacket usually opens and forms sharp points that look like talons." However, other fragments discovered in Mrs. Jordan's body were identified as coming from a high-powered assault rifle. Two notes were found in the

-9-

victim's clothing, both addressed to Mrs. Jordan and signed by the defendant. Dr. Turner concluded that the cause of Mrs. Jordan's death was multiple gunshot wounds.

Dr. Amy R. McMaster testified that she performed the autopsy on Jerry Hopper. Hopper had suffered multiple gunshot wounds and had multiple abrasions and lacerations resulting from these wounds. Dr. McMaster discovered a gunshot wound to the right wrist and two gunshot wounds to the right side of his abdomen. She recovered two projectiles from Hopper's body. The projectiles were large caliber deformed hollow point bullets, which were consistent with those fired from a nine-millimeter weapon. Dr. McMaster concluded that the cause of Jerry Hopper's death was multiple gunshot wounds.

Dr. McMaster said that she also performed the autopsy on David Gordon. Gordon had multiple gunshot wounds and injuries associated with the wounds. Although no exact number of wounds could be determined, Gordon had been shot at least thirteen times. He had wounds to his right thigh, right forearm, right lower abdomen, right and left sides of the torso, buttocks, and left hip. These wounds caused additional injury after entering Gordon's body. Dr. McMaster concluded that the cause of Gordon's death was multiple gunshot wounds.

Dr. Herbert Lee Sutton, a trauma surgeon at Jackson-Madison County General Hospital, testified that he treated James Goff on January 11, 2005, for multiple gunshot wounds which he described as "a gunshot wound to the neck, a gunshot wound to the left arm, . . . a gunshot wound to the abdomen, a gunshot wound to the left thigh." There was also a gunshot wound to the submandibular region of the neck which "went anterior to the trachea and the carotid vessels which are the main vessels that go[] to his brain and went anterior to the trachea." However, the bullet did not hit any major arteries or veins. Dr. Sutton stated that Goff remained hospitalized until January 13, 2005.

Dr. Sutton testified that he also tried to save David Gordon's life once he arrived at the hospital. Dr. Sutton was able to regain a heartbeat on Gordon and performed surgery to try to stop the bleeding in his abdomen and perineum. Dr. Sutton described what he saw when he surgically opened Gordon's abdomen: "[T]he blast injury from what he was shot with had almost morselized his intestines. It was like soup. And I'm quite sure even if I had stopped him from bleeding and he had regained everything, he probably wouldn't have had any small intestine left from what I could see." Despite all of Dr. Sutton's lifesaving procedures, Gordon died at 12:47 p.m.

Sergeant Mike Turner of the Jackson Police Department testified that he collected evidence from the red Mazda pickup truck. Among the items he recovered were: a loaded Norinco SKS 7.62 assault rifle with twenty-six rounds in the magazine and one in the chamber; a black racing bag containing a large quantity of assorted ammunition; a loaded Mossberg twelve-gauge shotgun with two rounds in the magazine and one in the chamber; loose ammunition; a 7.62 magazine with fourteen rounds of ammunition; a 7.62 spent casing; and a .38 special caliber

Winchester spent casing. The defendant's clothing, which was covered in blood, was also collected.

Agent Cathy Ferguson of the Tennessee Bureau of Investigation (TBI) testified that on January 11, 2005, she was employed as a violent crimes investigator with the Jackson Police Department. She said she responded to the scene at the TDOT garage and was directed to the crow's nest area where she found Mrs. Jordan lying in a large pool of blood that contained brain matter. Realizing that she could not help Mrs. Jordan, Ferguson assisted with the CPR on Jerry Hopper. Ferguson subsequently recovered evidence found inside the crow's nest and outside the garage, including nine-millimeter and 7.62 shell casings, bullet fragments, and a note on which Grimm had written the defendant's license tag number. She said that fifteen 7.62 shell casings were recovered from the exterior crime scene and four from inside the crow's nest. Nine nine-millimeter shell casings and one live nine-millimeter round were found inside the crow's nest.

TBI Agent Scott Lott testified that he and other agents executed a search warrant at the defendant's house on January 11, 2005. Among the items recovered were: a Thompson Center Firearms .50 caliber muzzleloader, a Montgomery Ward 30/30 rifle, a Remington 20-gauge pump shotgun, a Remington 30.06 rifle, a Remington Caliber .243 rifle, a Ruger .22-caliber rifle, a Savage Firearms .22-caliber rifle, a Ruger .44 magnum rifle, a Springfield .410-gauge shotgun, a Pioneer 750 .22-caliber rifle, a Bauer Firearms .25-caliber automatic handgun, a .38 Special revolver, five live rounds of Winchester .38 Special ammunition, and a trigger group assembly.

TBI Agent Shelly Betts, accepted by the trial court as an expert in ballistics, testified that she examined evidence collected from the TDOT garage, including a 12-gauge shotgun, a Norinco SKS rifle, a Star .45-caliber pistol, and an Inter Arms Star nine-millimeter semiautomatic pistol. She said that the safety feature functions on the SKS rifle had been converted to fire in fully automatic mode, rather than the semi-automatic mode, which was how it had been manufactured to function. She explained that several modifications had been made to the rifle's trigger housing assembly, causing the weapon to fire continuously once the trigger was pulled. Agent Betts tested several cartridge cases recovered from the crime scene and determined that they had been fired in the SKS rifle. Additionally, she tested nine-millimeter cartridge cases recovered from the interior crime scene and determined that they had been fired in the Star pistol. She examined bullet fragments recovered from David Gordon's right thigh and determined that one had "conclusively been fired through the barrel of the SKS rifle." Agent Betts further determined that some of the fragments recovered from Gordon's right hip and abdomen had been fired through the barrel of the SKS rifle. She also examined nine-millimeter projectiles recovered from Jerry Hopper's back and pelvis and determined they had been fired in the Star pistol. Her examination of the nine-millimeter projectiles recovered from Renee Jordan's leg and uterus revealed they had been fired in the Star pistol. Agent Betts said that the nine-millimeter projectile recovered from Mrs. Jordan's brain had "probably" been fired in the Star pistol. Two fragments recovered from Mrs. Jordan's liver, as well as three fragments recovered from her chest, were conclusively identified to the SKS rifle. Agent Betts explained that the 7.62 rounds found in the bodies of Mrs. Jordan and David Gordon were hollow point bullets, meaning that as

-11-

soon as they struck the skin they fragmented into numerous pieces. She examined the 7.62 magazine found inside the defendant's truck and described it as "an SKS-type detachable magazine that would function in this SKS rifle, and it holds approximately 31 rounds."

Madison County Sheriff's Department Sergeant Chad Lowery testified that shortly after the defendant was apprehended, he went to the defendant's home to check on the welfare of any children who may have been at the home, but no children were present when he arrived. Sergeant Lowery discovered a loaded pistol on top of the refrigerator and saw several other weapons in the home. On the kitchen counter, Sergeant Lowery observed a handwritten note, which stated: "Renee got what she deserved. Bitch. I'm sorry. I love you. Thanks for being so good to me. Love you Shelby, Sydney, Deanna. Thanks, Mom and Dad. You did all you could."

**Defense Proof**

Jackson Police Investigator Tyreece Miller testified that he interviewed the defendant at approximately 3:35 p.m. on the day of the shooting. The defendant waived his right to an attorney and volunteered to speak with Investigator Miller. During their conversation, the defendant asked how many people he had shot and if Mrs. Jordan was dead. The defendant provided a urine sample and consented to give a blood sample which was drawn at approximately 9:50 p.m. The defendant said he had consumed approximately five shots of vodka but "was not under the influence." The defendant also provided the following statement to Investigator Miller:

> I've been married to Renee Jordan for five years. She has a son named Tyler Surratt. He is my stepson. She has a daughter named Sydney Jordan. She is my daughter also by Renee. I have three others by two other women who are my former wives. Back in the summer 2002, Renee's son Tyler molested my daughter, Shelby Jordan. He was 10 years old and she was 8 years old at the time. [Department of Children's Services] was involved, and Tyler had to go to counseling. On December the 11th, 2004, Tyler was in Lindsey's bedroom. He was lying on his back and he had something in his hand. He was playing with Lindsey. He was trying to let her get whatever it was out of his hand, but he had a tight grip on it. She was reaching for it. He would let her grab his hand, and then he would pull her across his body. He didn't know it, but I was watching him. It looked like he was pulling her across his penis. I saw him do this three times before I stopped him. I went in the room. I cursed him. I told him that I was going to stick my foot up his ass if he ever touched one of my daughters again. I left and went deer hunting. When I got back, Renee was on the phone with some man. My mother showed up, and Renee left and never came back home. We did spend Christmas Eve, New Year's Eve and this past Sunday night together.
>
> Back in September 2004, Renee started having an affair with Johnny Emerson. He works in a building where she works. He works in the shop and

Renee works in the office. . . . I found out about their affair in October. She admitted to it and I forgave her. This morning I woke up and had no intentions of hurting Renee.

She called me from work. I was at home. She was acting like a bitch. I had been begging and bending over backwards to make this work up to this point. She unexpectedly told me that me and my daughters from another marriage have until the first of February to get out of her house. She said that she was going to see her lawyer tomorrow and she was going to have me evicted. . . . Renee hung up on me before I had a chance to say a word. This made my blood boil. I started loading my guns. I loaded my 12-gauge shotgun, a Star .45 caliber semi-automatic handgun and an SKS fully automatic rifle with a folding stock. I put a 33-round clip in it. I left a note on the counter stating that if something happens to me, I love my mother, father and four daughters. I didn't know if I was going to do anything to Renee or not. I was thinking more of killing myself.

I got in my 1991 Mazda truck, red, and I was going to Renee's workplace at TDOT. On the way there I broad-sided a green four-door vehicle. I was going down Anglin Lane. I was driving fast and couldn't stop soon enough. I T-boned the green car that was going down Lower Brownsville Road. I didn't stop. I went on up to TDOT. I pulled up to where Renee works. I left the 12-gauge and the SKS in the truck. I had the .45 in a holster on my hip, the nine-millimeter was in my back.

I walked in the office. Renee said, "What the fuck are you doing here?" She was sitting in the chair at her desk. I didn't say a word to her. I pulled out the .45 and I shot her in the leg. I shot her in the leg because I wanted her to look at me. She hollered. The guy that was sitting in the corner got up and came at me. I shot him and he fell to the floor. I think he was James Goff . . . . I heard him moaning. Larry Taylor was in the office. I patted him on the back with the pistol and told him that he needed to get out of there. He left. I looked back at Renee, and she was already dead I think. I can't remember if I had shot her more than just in the leg. I remember the last time that I shot her was in the top of the head with the .45. I didn't want to shoot her in the face.

I walked back out to my truck and I saw the guy in the green car that I had hit. He was parked behind me. I got in the truck. He was pointing his finger and coming at me. I grabbed the SKS and I fired it at him. He went to the ground. I don't remember going back to the office with the SKS, but if there was a shell casing there, I must have fired it in the office. I got in my truck and left. I had intentions of killing myself when I got back home, but the police hit me head on.

I have made this statement openly and freely. I have not been promised anything, and I have not been threatened in any way. I am sorry that this happened. Renee didn't deserve to die.

-13-

TBI Special Agent John W. Harrison testified that he analyzed the urine and blood samples submitted by the defendant. The result of the blood sample, taken at 9:50 p.m., was "no alcohol present." Agent Harrison agreed that if a person consumed five shots of vodka in the early morning hours but did not give a blood sample until 9:50 p.m., the alcohol could have metabolized by that time. He explained that if a person consumed five shots rapidly together within an hour, the person's blood-alcohol level would be approximately .10%, but about five hours later, the level would be down to 0. The result of the urine sample, taken at 3:35 p.m., was .17%. However, Harrison said not much significance should be attached to that result because it did not indicate how much the defendant had had to drink. He acknowledged that all the urine sample really revealed was that, sometime prior to the collection of the sample, there had been alcohol in the defendant's bloodstream. Pursuant to the TBI's normal operating procedure, the samples were preserved "for a period of time and then destroyed."

TBI Agent Kelly Hopkins testified that she performed a drug screen on the urine and blood samples submitted by the defendant. The urine sample was positive for Citalopram, an antidepressant, and Benzodiazepines, which include antidepressant and anti-anxiety medications, such as Xanax. The blood sample was positive for Citalopram but negative for Benzodiazepine. Agent Hopkins explained that after a drug is ingested, it first goes into the person's bloodstream and is later metabolized in the urine. She said that the sample was destroyed on January 3, 2006.

Officer Tikal Greer of the Jackson Police Department testified that when he and Officer Anderson transported the defendant to the Criminal Justice Complex, he noticed a strong odor of alcohol on the defendant's person. The defendant told the officers that "his wife was dead, full of holes" and that she had driven him crazy by "fucking around on him." The defendant also said that "he hated people got in the way" and that his wife "got a taste of his .45 and her brother's gun." Once they arrived at the Criminal Justice Complex, the defendant admitted "to killing or hurting four people."

Sergeant Marneina Murphy of the Madison County Sheriff's Department testified that she supervised the defendant's booking process at the jail. She estimated that she was around the defendant for thirty minutes to one hour and described his demeanor as "more confused, maybe not focusing, probably dazed a little bit." She acknowledged that another officer asked the defendant the questions on the intake questionnaire.

Dr. Dennis Wilson, a clinical psychologist, testified that he evaluated the defendant, meeting with him on four different occasions for a total of eleven hours. He conducted clinical interviews, IQ testing, and some brief personality testing. Dr. Wilson determined that the defendant was competent to stand trial and that a defense of insanity was not available. However, in Dr. Wilson's professional opinion, the defendant lacked substantial capacity when the crimes were committed, meaning the defendant was unable to exercise restraint or judgment and unable to reflect or premeditate.

In formulating his opinion, Dr. Wilson discovered that the defendant was brought up in a stable family. His parents were good parents and were active in the community. Dr. Wilson

opined that the defendant was determined to set up a loving, stable environment for his children whom he clearly loved. Dr. Wilson also noted that the defendant had been divorced twice and suffered from depression and anxiety. As a result, the defendant began self-medicating with alcohol and drugs, including methamphetamine and crack cocaine. In 1986, the defendant was injured in a car accident. He had a broken back and ribs and injuries to his knee, ankle, and pelvis. He developed chronic headaches and various pains. He was prescribed narcotic medications, including Hydrocodone, Oxycodone, Vicodin, Lortab, and Darvocet. In 2000, the defendant was prescribed Xanax, an anti-anxiety medication, and Ambien, for insomnia. The defendant, at various times, was given medications for depression and agitation.

At the time of his marriage to Mrs. Jordan in 2000, the defendant had stopped using illegal drugs and was only a moderate beer drinker. By the following year, however, their marriage had begun to deteriorate. They attended marriage counseling. Later, Mrs. Jordan told him that she desired other male companionship and, in October 2004, she started going to bars, staying out late, and coming home intoxicated. Mrs. Jordan also told the defendant about her relationship with a male co-worker and said she wanted to have sex with this co-worker. Divorce was imminent, and the defendant's family structure was crumbling. During this time, Mrs. Jordan continued her intimate relationship with the defendant but also shared the details of her encounters with other men with him. The defendant was confused and upset about her extramarital activities. The defendant's doctor increased his dose of Xanax on January 4, 2005. Mrs. Jordan then gave the defendant a deadline of February 1 for him and his two daughters to move out of the house. Dr. Wilson opined that this was the end of whatever was left of the defendant's dream of creating a happy home for his children.

Dr. Wilson further testified that on the date of the shooting, the defendant drank alcohol and had not slept for three days. His world had collapsed, and he could no longer control his behavior. The defendant started talking to himself. People observing the defendant after the shooting described him as being "out of it." The defendant expressed remorse over the incident and cooperated with the authorities. Dr. Wilson concluded:

[The defendant] has a major depressive disorder, recurrent episodes. It was moderate over his lifespan. He had generalized anxiety disorder, alcohol abuse and a borderline personality disorder. This is by definition someone who has a hard time maintaining interpersonal relationships, dealing with problems, coping with stress. He just never was any good with any of that stuff. At the time of the crime, it is my opinion that he was intoxicated with alcohol, and it is my opinion, I believe, that he was also intoxicated with anxiolytics which was the Xanax. These two drugs, alcohol and the Xanax, potentiate each other, and anything can happen if you take both of those things together. . . . [T]hey sort of multiply each other. They can easily do brain damage. . . .

. . . [D]issociative disorder is when someone . . . [t]here's a disruption in the usually integrated functions of consciousness, memory or perception of the environment. That's from the Diagnostic & Statistical Manual. . . .

-15-

You also have symptoms of what we call derealization. That's as if you're detached and you're an outside observer. It's like you're watching someone else do it. . . .

I don't think he was in control of his faculties when all this happened. I don't know if it was from the stress, from the depression, the anxiety, the dissociation, the intoxication, or, most likely a combination of all of the above.

Dr. Wilson opined that the defendant was substantially impaired to the extent that he was unable to form premeditation.

Asked on cross-examination if the defendant was in control at the time of the shooting, Dr. Wilson said that the defendant "was in control sometime before the crime and he became in control again after the crime, but during the crime he was not. I'm not sure. It's a gray area, a gradual change. I just don't know." Dr. Wilson opined that the defendant was not capable of forming intent at the time of the shooting. He said that the defendant "knew the difference between right and wrong. He was not insane. He was just incapacitated." Dr. Wilson explained that the defendant's "behavior was inconsistent and out of control. He was in and out of consciousness there. He knew some things, remembered some things and not others, but I don't think he was at all in control the whole time."

**Rebuttal Proof**

In rebuttal, the State recalled Investigator Tyreece Miller. Miller reiterated that, at the time the defendant gave his statement, the defendant said he had been drinking but was not under the influence of any drugs or alcohol. He said that the defendant walked steadily, was able to answer the questions he asked, and was "very coherent." Miller said that the defendant did not appear to be under the influence of drugs or alcohol. The defendant consented to give a urine sample but initially refused to provide a blood sample because he did not like needles. Following the department's standard operating procedures, Miller wrote down the defendant's statement as he talked and allowed him to review it before he signed it. Asked if the defendant made any additional comments that were not included in his statement, Miller said the defendant told him, "Today is Renee's father's birthday. I guess I gave him a hell of a birthday present." According to the driver's license belonging to Mrs. Jordan's father, his date of birth was January 11, 1932. Miller asked the defendant if he could include the birthday present comment in the statement, but the defendant said, "I don't want that in there." The defendant also told Miller, "[Mrs. Jordan] was in a pool of blood the last time I shot her."

On cross-examination, Investigator Miller said that the defendant signed a waiver of his rights at 3:50 p.m. and signed his statement at 5:35 p.m. The defendant eventually gave his consent for a blood sample at 9:50 p.m. Miller acknowledged that a breathalyzer test was not performed on the defendant and that the defendant told him he was taking medication. Miller said that although the police department had video equipment, he did not have it brought to the Criminal Justice Center to videotape the defendant's interview because it was against

departmental policy and not standard operating procedure. Miller said he was not aware of the availability of any video equipment in the booking area of the Criminal Justice Center.

Dr. Daryl Matthews, a forensic psychiatrist, testified that he evaluated the defendant on April 24, 2006. Dr. Matthews spent approximately six hours with the defendant, during which he conducted a psychiatric interview and a mental status evaluation. As a result of his examination of the defendant, Dr. Matthews did not find a severe mental disorder and said, "I don't believe [the defendant] has ever had a severe mental disorder." Dr. Matthews concluded that the defendant "was able at the time of the offense . . . to act intentionally and to act with premeditation." He added that the defendant was able to conform his behavior to the requirements of the law.

In reaching his determination that the defendant had the capacity to premeditate, Dr. Matthews said he reviewed, among other things, the note the defendant wrote to Mrs. Jordan, the recorded messages the defendant left on Mrs. Jordan's cellular telephone, the statements of various witnesses at the scene, and the police reports. The messages the defendant left on Mrs. Jordan's phone included sarcastic comments about her obtaining a restraining order and statements such as: "I hope you go to work tomorrow, bitch, 'cause you'll be there one day. It may not be tomorrow, but I will catch up with your raggedy ass. Your day is coming. . . . Your ass is gonna pay." Dr. Matthews said that the defendant's ability to recognize someone he knew at the scene, Freddie Ellison, implied that he "had the ability in memory to keep in mind people that he knew, and most importantly . . . he had the ability not to . . . shoot Mr. Ellison." Dr. Matthews disagreed with Dr. Wilson that the defendant was dissociated at the time of the shooting, saying that dissociation is very common, mostly pertains to memory, and has nothing to do with intent or premeditation.

Among the witness statements Dr. Matthews reviewed was that of Walter Forsythe, which Dr. Matthews recited:

> The driver of the red truck told the driver of the green car to get out of here. The driver of the green car said, "No, you hit me." The driver of the red truck folded the seat forward on the truck and he said, "You will." He pulled out a black rifle with a silencer or something on the end of the barrel. He fired at the driver of the green car.

Dr. Matthews also recited the statement of George W. Bond, Sr.: "The man with the gun was white. He looked up and saw me and shook his head as if to tell me he didn't want me involved." Dr. Matthews said that the defendant's statement to Sergeant Johnny Briley, "Renee fucked me over, Johnny," showed that the defendant recognized Briley and indicated the intactness of his mental capacity. Dr. Matthews read the statement of Freddie Ellison: "When I saw [the defendant], he had a gun and was trying to hide it. I said, 'David, what are you doing?' He said, 'Just go on.' I said, 'What's the matter? He said, 'Just go on.'" Dr. Matthews concluded that the defendant was able to control himself at the time of the shooting.

The jury convicted the defendant of the first degree premeditated murder of Renee Jordan, the first degree premeditated murder of Jerry Hopper, the first degree felony murder of Jerry Hopper, the first degree premeditated murder of David Gordon, the first degree felony murder of David Gordon, the attempted first degree murder of James Goff, the aggravated assault of James Goff, the attempted first degree murder of Larry Taylor, the aggravated assault of Larry Taylor, and leaving the scene of an accident. The trial court merged the convictions for the felony murder and premeditated murder of Jerry Hopper into a single conviction for first degree murder and, similarly, merged the convictions for the felony murder and premeditated murder of David Gordon into a single conviction for first degree murder. The court also merged the two aggravated assault convictions with the two attempted first degree murder convictions.

**Penalty Phase**

Donald Roberson, Renee Jordan's father, testified that she was the youngest of his three children and his only daughter. One son died of cystic fibrosis when he was seven years old, and the other son died at age thirty-three. Roberson related that Renee's daughter, Sydney, was four years old at the time of her mother's death and that he and his wife currently had custody of her. He said that Sydney still asks for her mother. Since Renee's death, Roberson has experienced "attacks, anxiety and depression." Roberson added that Renee was murdered on his birthday, and he is no longer able to celebrate his birthday.

Robert E. Lee Gordon, Jr., the older brother of David Gordon, testified that David was one of four brothers and that his other two brothers were deceased at the time of David's death. Gordon, Jr. explained the impact of the death of his last remaining brother on him and his family. He said that he has difficulty sleeping and that his brother's death is "all I think about, the way he died." One of David's sons was in college and the other in high school, but both gave up on school as a result of their father's death. Gordon, Jr. said he had buried two brothers and his mother in the past two years. He related that David was a hard worker, a good father, and "very well respected . . . a fine man."

Shane Gordon, the eighteen-year-old son of David Gordon, testified that he was a junior in high school when his father was killed. He said that he thought about his father's death "all the time and it gets me down. . . . It's just something that's hard to deal with." He said that his father was a hard worker and was kind to everyone.

Renee Dawson testified that David Gordon was her fiancé and best friend. On the date of his murder, Ms. Dawson and Gordon had a lunch date planned. The couple had moved into a new home together on Thanksgiving Day, but Ms. Dawson was unable to keep the home after Gordon's death. Ms. Dawson stated, "I would say that my life is empty and my life ended that day as well."

Emma Hopper, the wife of Jerry Hopper, testified that they had been married twenty-nine years. She explained that losing her husband was like "losing half of myself." Mr. Hopper

worked for the Tennessee Division of Forestry and had been a state employee for twenty-eight years. At the time of his murder, Mr. Hopper had already been making plans for retirement. Mrs. Hopper explained that the couple planned on spending more time with their young granddaughter, who was eighteen months old at the time of Mr. Hopper's death. She said that she had not been able to spend a single night in their home since his death and had been living with her daughter and her family. Mrs. Hopper testified that her granddaughter still asks, "Where is my papaw?"

Misty Ellis, the daughter of Jerry Hopper, testified that she had worked with victims of crimes in the past. She described her experience dealing with her father's death as an "[a]bsolute nightmare." Ellis said that it was "just torture" to know that one day she would have to explain to her daughter why her grandfather was no longer here.

TBI Agent Cathy Ferguson testified that, at the time of the shooting, she was a violent crimes investigator with the Jackson Police Department. Agent Ferguson identified photographs of the victims. Exhibit 179 was a photograph of James Goff depicting the bullet wound to his abdomen. Exhibit 180 was a photograph of James Goff depicting the bullet wound to his neck. Exhibits 181 and 182 were photographs of Larry Taylor depicting the gunshot wounds to his legs. The photographs of Goff and Taylor were taken at the emergency room. Exhibit 183 was a photograph depicting Renee Jordan as she was found in the crow's nest at the TDOT garage.

Dr. Amy McMaster testified that Dr. Staci Turner performed the autopsy on Renee Jordan. Identifying exhibit 184 as a photograph depicting a gunshot wound Mrs. Jordan's forehead, Dr. McMaster stated that the wound was inflicted from a close range. She explained that it was a "close range wound because there's soot," or burnt gunpowder. She said that the wound to the forehead was a fatal wound. The autopsy further revealed a gunshot wound to the back of Mrs. Jordan's head, which went through her head and exited on her face. Exhibit 185 was a photograph depicting the gunshot wound to the back of the head. Dr. McMaster stated that this wound also would have been fatal.

Dr. McMaster also identified nine entrance wounds on Mrs. Jordan's torso. She stated that there was significant injury to the abdominal area, which was a potentially fatal wound. Dr. McMaster said that this wound would have been painful. She explained, "[I]n general terms, the body has about 30 seconds' worth of reserve of oxygen in the brain. So assuming your heart stops immediately, you've got about 30 seconds left of oxygen in your brain that will allow you to remain conscious." She affirmed that, during this time, one could experience pain. She added that, depending on other factors such as adrenaline, this time period could be longer. Dr. McMaster additionally stated that the wounds were from two different caliber bullets. She said there was no indication that any of the wounds were received post-mortem.

Regarding the autopsy of Jerry Hopper, Dr. McMaster testified that he had two gunshot wounds to his abdomen, which injured segments of bowel and also segments of the aorta. Dr. McMaster stated that these wounds would not have been immediately fatal but would have been

painful. Hopper also sustained a gunshot wound to his right wrist. Dr. McMaster was unable to determine the order in which the wounds were inflicted.

Dr. McMaster testified that she performed the autopsy on David Gordon. Gordon had "at least 13 entrance wounds" which were inflicted from the front, the side, and the back of the body. Gordon sustained injury to his bowel area, specifically, the natal cleft. The wounds sustained to the buttocks and natal cleft could be consistent with Gordon being facedown on the pavement. She opined that the number of wounds were more than that necessary to cause death. She added that the wounds would have been painful and that Gordon would have eventually lost consciousness.

In mitigation, the defendant presented the following testimony. Larry Jordan, the defendant's brother, testified that, during their childhood, he and the defendant played ball and went fishing and hunting. Their father was their Little League coach. Larry Jordan stated that he would be devastated if his brother was sentenced to death. He added that, if his brother received a sentence of life without parole, he would maintain his relationship with him. Larry Jordan testified that the defendant has a close relationship with his four daughters.

Suzie Silas, a guidance counselor at Malesus Elementary School, testified that the defendant had obtained custody of Shelby and Lindsey, his daughters from a previous marriage. She characterized the defendant as a concerned parent and said that he regularly checked on his children. After the defendant was incarcerated, Lindsey wrote a letter expressing her desire to spend a day with the defendant because "I miss my daddy very much." Ms. Silas also received a letter from the defendant after his incarceration, thanking her for helping his children.

Michael Lee Merriwether testified that he met the defendant while incarcerated at the Criminal Justice Complex. He stated that he and the defendant often read Christian literature. Merriwether added that it was a benefit to him to have this interaction with the defendant. He opined that the defendant has the ability to do some good while in jail, including ministering to others.

Cheryl Fisher testified that she dated the defendant before his marriage to Renee Jordan. They remained friends after their romantic relationship ended. She opined that, if the defendant received a sentence of life, his children would benefit. She explained that the defendant was a very good father and that his children idolized him. Ms. Fisher related how the defendant's children were having difficulty rationalizing the potential punishment of death.

Madison County Deputy Andre Denice Hays, a jailer at the Criminal Justice Complex, testified that she had frequent contact with the defendant and described him as quiet and polite. Deputy Hays opined that the defendant would make a good prisoner and would be able to serve a sentence of life without parole without being a risk to any prisoner, guard, or other human being.

Sergeant Neina Murphy, also assigned to the Criminal Justice Complex, testified that she had not had any problems with the defendant since his incarceration. She affirmed that the defendant had not demonstrated to her that he would be a threat to any prisoner, guard, or other human being. She added that she would be disturbed if the defendant received the death penalty.

Madison County Deputy Jason Walker, a jailer at the Criminal Justice Complex, testified that the defendant often mentioned his family. Deputy Walker stated that the defendant's demeanor was pleasant, he never complained, and he did what he was told to do. He described the defendant as one of the better inmates. Deputy Walker opined that the defendant would make a good prisoner in the penitentiary and would not be a threat to other individuals.

Deanna Jordan, the defendant's oldest daughter, testified that she was a junior at Freed-Hardeman University. She said that she had three sisters, Lindsey, Shelby, and Sydney, and that they all loved their father and knew that he loved them. She stated that her father will not be able to walk her down the aisle, however, she would like for him to be able to meet his grandchildren some day. She stated that she wanted the defendant to have a part in their lives, even if it was just visitation.

Dr. Dennis W. Wilson presented a PowerPoint presentation regarding the psychological point of view of the mitigating factors. He explained that the defendant started life in a stable and loving family but later suffered from depression, anxiety, and insomnia. He stated that the defendant began using drugs and alcohol. Dr. Wilson told of the defendant's two failed marriages before marrying Renee. He mentioned the defendant's four children. He described the defendant's health problems and prescription medications. Dr. Wilson testified regarding the disintegration of the defendant's marriage to Mrs. Jordan. He said the defendant took too much Xanax, drank vodka, lost control, and "fell apart."

Dr. Wilson also described the defendant's remorse expressed very soon after the incident. He verified the defendant's status as a model prisoner. He added that the defendant was fully aware that he will spend the rest of his life in prison. Dr. Wilson opined that the structured setting of incarceration was good for the defendant because the stressors of every day life were gone. The defendant had adjusted well to the environment. Dr. Wilson added that the defendant had been a loving and active father.

Dr. Wilson provided his opinion as a clinical psychologist:

[The defendant] was under a lot of stress. He has a long history of not being able to deal with stress or change, and he was disturbed at the time of this crime.

. . . [H]e was impaired also due to that chronic depression and anxiety, plus the intoxication. He just wasn't used to drinking that much. He took the Xanax in an attempt to try to sleep or calm down. He wasn't trying to get intoxicated, but the net effect was that he became impaired. . . .

. . . Confinement is -- No one will ever have to worry about him doing something like this ever again, and even inside the prison system, he's likely to have a calming effect. . . . And importantly, he will be punished for what he did.

Gary Morris, the pastor of Bemis United Methodist Church, testified that the defendant's parents were members of his congregation. Since the incident, Morris had visited the defendant at the jail between thirty-five and fifty times. He recalled that, the day after the defendant's arrest, the defendant appeared dazed and confused. The defendant was very tearful and emotional and asked Morris to attend Mrs. Jordan's funeral. Morris stated that the defendant had expressed his repentance and remorse. He added that it would be devastating to the family if the defendant received a sentence of death.

At the close of the proof, the trial court instructed the jury on the following statutory aggravating circumstances:

Number 1: The Defendant knowingly created a great risk of death to two or more persons other than the victim murdered during the act of murder. That aggravating circumstance could possibly apply to Count 1, 2 or 3.

Number 2: The murder was especially heinous, atrocious or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death. Counts 1, 4 or 5 possibly.

Number 3: The murder was committed for the purpose of avoiding, interfering with or preventing a lawful arrest or prosecution of the Defendant or another. Consideration of Counts 2, 3, 4 and 5.

Number 4: The murder was knowingly committed, solicited, directed or aided by the Defendant while the Defendant had a substantial role in committing or attempting to commit first degree murder. Knowingly means that a person acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist. A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result. The requirement of knowingly is also established if it is shown that the Defendant acted intentionally.

Intentionally means that a person acts intentionally with respect to the nature of the conduct or to a result of the conduct when it is the person's conscious objective or desire to engage in the conduct or cause the results.

That one is for consideration on Counts 1 through 5.

Number 5: The Defendant committed mass murder which is defined as the murder of three or more persons, whether committed during a single criminal episode or at different times within a 48-month period. For consideration of Counts 1 through 5.

Number 6: The Defendant knowingly mutilated the body of the victim after death. For consideration in Count 1.

See, generally, Tenn. Code Ann. § 39-13-204(i)(3),(5), (6), (7), (12), (13). The trial court additionally instructed the jury as to applicable mitigating circumstances as follows:

Tennessee law provides that in arriving at the punishment, the jury shall consider . . . any mitigating circumstances raised by the evidence which shall include, but are not limited to the following:

Number 1: The murder was committed while the Defendant was under the influence of extreme mental or emotional disturbance.

Number 2: The capacity of the Defendant to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law was substantially impaired as a result of mental disease or defect or intoxication which was insufficient to establish a defense to the crime but which substantially affected his judgment.

Number 3: The Defendant has adjusted well to the structure of prison life.

Number 4: The Defendant has expressed remorse, has accepted responsibility for his actions and is willing to accept punishment for his crimes.

Number 5: The Defendant has a loving and supportive family.

Number 6: Any other mitigating factor which is raised by the evidence produced by either the prosecution or defense at either the guilt or sentencing hearing. That is, you shall consider any aspect of the Defendant's character or record or any aspect of the circumstances of the offense favorable to the Defendant which is supported by the evidence.

See, generally, Tenn. Code Ann. § 39-13-204(j)(2), (8), (9). After receiving further instructions from the court, the jurors retired from open court to begin their deliberations.

As to the first degree murder of Renee Jordan, the jury returned a verdict of death, finding that the State had proven the following statutory aggravating circumstances beyond a reasonable doubt:

Number 1: The Defendant knowingly created a great risk of death to two or more persons other than the victim murdered during the act of murder.

2: The murder was especially heinous, atrocious or cruel [in] that it involved torture or serious physical abuse beyond that necessary to produce death.

4: The murder was knowingly committed, solicited, directed or aided by the Defendant while the Defendant had a substantial role in committing or attempting to commit that first degree murder. . . .

5: The Defendant committed mass murder which is defined as the murder of three or more persons, whether committed during a single criminal episode or at different times within a 48-month period.

And 6: The Defendant knowingly mutilated the body of the victim after death.

The jury further found that these aggravating circumstances outweighed any mitigating circumstances beyond a reasonable doubt.

As to the first degree murder of Jerry Hopper, the jury returned with its verdict of death, finding that the State had proven the following statutory aggravating circumstances beyond a reasonable doubt:

1: The Defendant knowingly created a great risk of death to two or more persons other than the victim murdered during the act of murder.

3: The murder was committed for the purpose of avoiding, interfering with or preventing a lawful arrest or prosecution of the Defendant or another.

4: The murder was knowingly committed, solicited, directed or aided by the Defendant while the Defendant had a substantial role in committing or attempting to commit first degree murder. . . .

. . . .

5: The Defendant committed mass murder which is defined as the murder of three or more persons, whether committed during a single criminal episode or at different time[s] within a 48-month period.

The jury further found that these aggravating circumstances outweighed any mitigating circumstances beyond a reasonable doubt.

As to the first degree murder of David Gordon, the jury returned with its verdict of death, finding that the State had proven the following statutory aggravating circumstances beyond a reasonable doubt:

2: The murder was especially heinous, atrocious or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death.

3: The murder was committed for the purpose of avoiding, interfering with or preventing a lawful arrest or prosecution of the Defendant or another.

4: The murder was knowingly committed, solicited, directed or aided by the Defendant while the Defendant had a substantial role in committing or attempting to commit first degree murder.

. . . .

5: The Defendant committed mass murder which is defined as . . . [the murder] of three or more persons, whether committed during a single criminal episode or at different times within a 48-month period.

The jury further found that these aggravating circumstances outweighed any mitigating circumstances beyond a reasonable doubt.

A sentencing hearing on the noncapital offenses was held at a later date. At the conclusion of that hearing, the trial court imposed a twenty-five-year sentence for each of the attempted first degree murder convictions (Counts 6 and 8); a six-year sentence for each aggravated assault conviction (Counts 7 and 9); and a thirty-day sentence for leaving the scene of an accident (Count 10). The trial court merged Counts 6 and 7 and Counts 8 and 9. The court ordered that the two twenty-five-year sentences be served consecutively for an effective sentence of fifty years.

## ANALYSIS

### I. Guilt Phase Issues

### A. Sufficiency of the Evidence

The defendant does not challenge the sufficiency of the evidence to support his convictions for first degree murder.[2]  Notwithstanding, we have reviewed the evidence introduced at trial and conclude that there is sufficient evidence contained in the record to

_____

[2]The defendant also did not challenge the sufficiency of the evidence for his convictions of attempted first degree murder and leaving the scene of an accident.

support a finding by the trier of fact that the defendant was guilty of first degree murder on all three counts beyond a reasonable doubt. Tenn. R. App. P. 13(e).

## B. Limiting Instruction

The State's expert, Dr. Matthews, testified that he relied "a great deal" on the "statements of the various people who were at the scene" regarding statements made by the defendant. The defendant objected to the use of these statements. The trial court stated, "If it goes to the basis of forming his opinion, I will allow it." Dr. Matthews then related the statement made by Walter Forsythe:

> This is . . . an interview that was conducted of Mr. Walter Forsythe, and in Mr. Forsythe's statement he said, "The driver of the red truck told the driver of the green car to get out of here. The driver of the green car said, "No, you hit me." The driver of the red truck folded the seat forward on the truck and he said, "You will." He pulled out a black rifle with a silencer or something on the end of the barrel. He fired at the driver of the green car.

The defendant again objected, complaining that there was no silencer on the weapon and asking for a limiting instruction. The trial court stated that the "jury will be told they've got to look to the basis . . . of the expert's opinion, how he formed his opinion, what he relied on. All that's in the charge. They're going to get it at the proper time." Dr. Matthews continued to testify about statements of witnesses he referred to in making his opinion and quoted facts from those statements. The defendant continued to object to the use of the statements. The defendant objected to the jury charge, which failed to instruct the jury not to consider hearsay as substantive evidence:

> THE COURT: Anything further gentlemen?
>
> [DEFENSE COUNSEL]: . . . We need more of a limiting instruction on expert testimony that deals with this situation where we've got hearsay that the expert is relying upon. The jury needs to be . . . instructed that that evidence only goes to show . . . what weight to give that expert's opinion and . . . they're not to consider that hearsay information as substantive evidence in the case, and we've got numerous examples of that in this case, especially with Dr. Matthews, and we need that limiting instruction, I think.
>
> . . . .
>
> THE COURT: I've got the TPI, the pattern jury instruction, and I'm not limiting what counsel argues or points out to the jury as they present their argument to the jury about . . . what the expert relied upon in forming the opinion. In fact, the TPI is very clear in 42.02, ". . . that part of that decision will depend on your judgment about whether the witness['s] background or training and experience is sufficient for the witness to give the expert opinion that you heard. You must also decide

-26-

whether the witnesses' opinions were based on sound reasons, judgment and information." And that's the pattern TPI, not a – in its entirety, but as I pointed out earlier, counsel can make any argument to this jury they wish to make.

The defendant complains that the jury charge failed to caution the jury about hearsay related by experts.

Tennessee Rule of Evidence 703 provides that an expert may base an opinion upon inadmissible hearsay, if the type of hearsay is one that would be reasonably relied upon by experts in that situation. The Advisory Committee Comment to Rule 703 provides: "If the bases of expert testimony are not independently admissible, the trial judge should either prohibit the jury from hearing the foundation testimony or should deliver a cautionary instruction." The State concedes, and we agree, that the better practice would have been for the lower court to give a jury instruction that these statements should be used solely to understand and assess the expert's testimony.

The question then becomes whether the trial court's failure to provide the instruction is harmless error. The Tennessee Rules of Appellate Procedure provide for harmless error review. See Tenn. R. App. P. 36(b). However, "[a]ll errors are not the same, nor do they have the same effect on the judicial process in general or on a particular trial." State v. Rodriguez, 254 S.W.3d 361, 371 (Tenn. 2008). Tennessee law places the burden on the defendant who is seeking to invalidate his or her conviction to demonstrate that the error "more probably than not affected the judgment or would result in prejudice to the judicial process." Tenn. R. App. P. 36(b). While substantial evidence of the defendant's guilt makes it difficult for "the defendant to demonstrate that a non-constitutional error involving a substantial right more probably than not affected the outcome of the trial," harmless error inquiry "does not turn upon the existence of sufficient evidence to affirm a conviction or even a belief that the jury's verdict is correct." Rodriguez, 254 S.W.3d at 372 (citations omitted). Rather, "the crucial consideration is what impact the error may reasonably be taken to have had on the jury's decision-making. Id. (citations omitted).

Dr. Matthews utilized the witness statements of Barbara Surratt, George Bond, and Freddie Ellison. These witnesses testified at trial. There was no meaningful difference between the contents of their statements and their live testimony. Dr. Matthews also utilized the statements of the police officers. These officers testified at trial. There was no meaningful difference between the contents of their statements and the officers' live testimony. Dr. Matthews also referred to a statement of police officers in which the defendant expressed a desire for a death sentence. Based upon review of the record and specifically the testimony of Dr. Matthews, we cannot conclude that there is a reasonable probability that a limiting instruction on the hearsay used as the basis of Dr. Matthews' opinion would have altered the jury's view of Dr. Matthews' opinion. The defendant is not entitled to relief on this issue.

## II. Penalty Phase Issues

### A. Failure to Videotape Statements

-27-

The defendant contends that his rights to a fair trial, including his right to confrontation, were violated by the interpretations of his confession to the investigator which was not videotaped. Investigator Tyreece Miller testified that the defendant was not under the influence at the time of his interview. He added that the defendant was bragging and proud. The defendant asserts that the police department had video recording equipment. At trial, Investigator Miller testified that it would have been against standard operating procedure for him to take the video equipment to the Criminal Justice Complex. As a result, the defendant's statement was comprised of the answers to the questions Investigator Miller asked him, which Miller wrote down. The defendant argues that had the jurors been privy to the defendant's actual demeanor when giving his statement, they could have determined for themselves if the expressions of the defendant were really those of regret rather than bragging. The defendant concludes that the denial of electronic or video recording denied the trier of fact an essential tool in determining a life or death sentence.

In State v. Rollins, 188 S.W.3d 553, 564-65 (Tenn. 2006), our supreme court held that there was no state or federal constitutional right requiring the electronic recording of interrogations. Indeed, the court wrote:

> In State v. Godsey, 60 S.W.3d 759 (Tenn. 2001), this Court rejected the argument that failing to electronically record interrogations requires suppression of any statements resulting from the interrogations. We acknowledged that courts in Alaska and Minnesota require interrogations to be electronically recorded, id. at 771, but we pointed out that courts in fifteen other states had refused to impose such a requirement, id. at 772 n.7. More importantly, we emphasized that "neither the state nor the federal constitution requires electronic recording of interrogations." Id. at 771.
>
> Although we found no constitutional or statutory authority mandating that interrogations be electronically recorded, we recognized in Godsey that such a rule would reduce the amount of time spent in court resolving disputes over what occurred during interrogations and relieve the judiciary of the burden of resolving such disputes. Id. at 772. We further opined that given "the slight inconvenience and expense associated with electronically recording custodial interrogations, sound policy considerations support its adoption as a law enforcement practice." Id. Ultimately, however, we held that "the issue of electronically recording custodial interrogations 'is one more properly directed to the General Assembly.'" Id. (quoting State v. Odom, 928 S.W.2d 18, 23-24 (Tenn. 1996)). In so holding, we emphasized that "'[t]he determination of public policy is primarily a function of the legislature.'" Id. (quoting Griffin v. Shelter Mut. Ins. Co., 18 S.W.3d 195, 200-01 (Tenn. 2000)).

Id. at 564.

Our supreme court opined that:

whether, as a matter of public policy, Tennessee should mandate electronic recording of custodial interrogations is a question for the General Assembly, not this Court. A defendant's statement need not be suppressed because a law enforcement agency has adopted a policy against recording interrogations. Such a policy does not violate the heightened due process concerns that apply in capital cases.

Id. at 565.  Accordingly, we cannot conclude that the defendant's rights to a fair trial were violated by the failure to have his statement videotaped.  The defendant is not entitled to relief on this issue.

## B. Trial Court's Application of Rule of Sequestration

The defendant contends that the trial court should have permitted members of his family to remain in the courtroom and testify during the sentencing phase of the trial, since the victims' family members were permitted to do so.  Specifically, he complains that it was unfair for the trial court to apply the rule of sequestration to prevent Larry Jordan and Deanna Jordan, who both testified during the penalty phase, from remaining in the courtroom during the guilt phase, and his parents, Don and Kay Jordan, from testifying at the penalty phase because they had attended the guilt phase of the trial.  The defendant argues that the trial court's exclusion of his family members pursuant to the rule of sequestration violated his rights to a fair and public trial, equal protection under the laws, and individualized sentencing.  He further argues that Tennessee Code Annotated section 39-13-201(c), which provides that a victim's family members or representatives may offer victim impact testimony at sentencing despite having attended the guilt phase of a defendant's trial, violates the doctrine of separation of powers, as the legislature's enactment of the statute amended the rule of sequestration, thereby encroaching upon the powers of the judiciary.

Tennessee Code Annotated section 39-13-204(c) provides, in pertinent part:

The court shall permit a member or members, or a representative or representatives of the victim's family to testify at the sentencing hearing about the victim and about the impact of the murder on the family of the victim and other relevant persons.  The evidence may be considered by the jury in determining which sentence to impose.  The court shall permit members or representatives of the victim's family to attend the trial, and those persons shall not be excluded because the person or persons shall testify during the sentencing proceeding as to the impact of the offense.

Tennessee Rule of Evidence 615, "Exclusion of Witnesses," provides in pertinent part:

At the request of a party the court shall order witnesses, including rebuttal witnesses, excluded at trial or other adjudicatory hearing.  In the court's discretion, the requested sequestration may be effective before voir dire, but in

any event shall be effective before opening statements. The court shall order all persons not to disclose by any means to excluded witnesses any live trial testimony or exhibits created in the courtroom by a witness. This rule does not authorize exclusion of (1) a party who is a natural person, or (2) a person designated by counsel for a party that is not a natural person, or (3) a person whose presence is shown by a party to be essential to the presentation of the party's cause.

The rule may be invoked at any time and is mandatory. State v. Anthony, 836 S.W.2d 600, 605 (Tenn. Crim. App. 1992). The purpose of the rule of sequestration is to prevent witnesses from altering their version of events after hearing the testimony of another. State v. Harris, 839 S.W.2d 54, 68 (Tenn. 1992).

The defendant first argues that the trial court's application of the rule of sequestration to exclude certain of his family members from his trial violated his rights to a public trial. We respectfully disagree.

The Sixth Amendment to the United States Constitution and Article I, Section 9 of the Tennessee Constitution afford an accused the right to a "public trial." See In re Oliver, 333 U.S. 257, 68 S. Ct. 499 (1948); State v. Schiefelbein, 230 S.W.3d 88, 114 (Tenn. Crim. App.), perm. to appeal denied (Tenn. 2007); State v. Sams, 802 S.W.2d 635 (Tenn. Crim. App. 1990). This right is regarded as "a shared right of the accused and the public, the common concern being the assurance of fairness." Press-Enterprise Co. v. Superior Court, 478 U.S. 1, 7, 106 S. Ct. 2735, 2739 (1986). "Transparency," it has been said, "is essential to maintaining public respect for the criminal justice system, ensuring its integrity, and protecting the rights of the accused." Smith v. Doe, 538 U.S. 84, 99, 123 S. Ct. 1140, 1150 (2003). One purpose of a public trial is to allow a defendant the presence of a friend "who might give him legitimate assistance or comfort without interfering" with the proceedings. Commonwealth v. Marshall, 253 N.E.2d 333, 334 (Mass. 1969).

The right to a public trial is not absolute, however, and in certain cases must yield to other rights or interests. See Waller v. Georgia, 467 U.S. 39, 45, 104 S. Ct. 2210, 2215 (1984). In this case, the trial court did not exclude all of the defendant's relatives. The defendant's brother and daughter were excluded from the courtroom as both testified during the penalty phase. Because Larry Jordan and Deanna Jordan were potential witnesses, they were no longer considered members of the general public for purposes of exclusion from the courtroom. See Tharp v. State, 763 A.2d 151, 160 (Md. 2000).

The defendant cites State v. Sams, 802 S.W.2d 635 (Tenn. Crim. App. 1990), in support of his argument that the exclusion of his family members from the courtroom violated his right to a public trial. Sams, however, is readily distinguishable from the case at bar. In that case, the prosecutor issued subpoenas for five members of the defendant's family in the middle of trial, solely to have them excluded from the courtroom under Rule 615 and without any serious intention of calling them as witnesses. Id. at 640-41. Barring such rare circumstances, exclusion

of witnesses pursuant to Rule 615 does not violate a defendant's right to a public trial. See Neil P. Cohen et al., Tennessee Law of Evidence § 6.15[10] (5th ed. 2005) ("Despite the lack of authorities on point, it is clear that sequestration of witnesses in the ordinary case does not violate a right to a public trial."). As such, we conclude that the trial court did not err by excluding the defendant's mitigation witnesses from the guilt phase of the trial, or by excluding the defendant's parents from testifying at the sentencing phase after they had attended the guilt phase.

The defendant also contends that the trial court's order unfairly prohibited him from introducing the potential mitigating evidence that would have been offered by his parents. He argues that forcing him to choose between having his parents' supportive presence at trial or their mitigation testimony at sentencing deprived him of his right to individualized consideration of mitigating factors, in violation of the holding in Skipper v. South Carolina, 476 U.S. 1, 106 S. Ct. 1669 (1986). We, again, respectfully disagree.

Under Skipper, a defendant has a right to place before the sentencer "relevant evidence in mitigation of punishment," which includes evidence of the nature and circumstances of the crime as well as the defendant's character and background. 476 U.S. at 4, 106 S. Ct. at 1671. The defendant cites a number of cases in support of the proposition that relevant mitigation evidence, such as the kind that would have presumably been offered by his parents, should be admitted at the sentencing phase of a capital trial. He cites no case law, however, for the proposition that the rule of sequestration should not be applied to exclude potential mitigation witnesses from attending the guilt phase of a trial. Nor has he offered any rationale to show that the purpose behind the rule – to prevent witnesses from adjusting their testimony based on the evidence otherwise presented at trial – does not exist for mitigation witnesses. We conclude, therefore, that the defendant is not entitled to relief on the basis of this claim.

Finally, the defendant contends that the provision of Tennessee Code Annotated section 39-13-204(c) that permits members of the victims' families to both attend the guilt phase of the trial and testify during the sentencing proceeding violates separation of powers principles. Our supreme court, however, has rejected this argument. See State v. Odom, 137 S.W.3d 572, 604 (Tenn. 2004) (adopting in appendix this court's conclusion that the provision "does not violate the separation of powers clauses of either the Constitution of the State of Tennessee or the Constitution of the United States of America").

### C. Prosecutorial Misconduct

The defendant contends that the prosecution committed misconduct by (1) misleading the jury about its role in the sentencing decision; (2) making inflammatory arguments during the penalty phase of the trial; and (3) destroying urine and blood samples, which violated his right to a reliable sentencing determination. A prosecutor commits misconduct by the use of deceptive or reprehensible methods in an attempt to persuade either the court or the jury. See State v. Rimmer, 250 S.W.3d 12, 41 (Tenn. 2008) (citing People v. Strickland, 523 P.2d 672 (1974)), cert. denied, __ U.S. __, 129 S. Ct. 111 (2008).

## 1. Argument to Jury

The defendant first contends that the prosecution misled the jury about its role in sentencing by arguing that the defendant, not the jury, was responsible for the sentence of death.[3] He cites the following excerpt from the prosecution's closing argument:

> Defense counsel would talk about the guilt trip he's putting on you with God and judgment. Let me tell you, ladies and gentlemen, what takes care and addresses that argument by defense counsel, is rendering unto Caesar that which is Caesar's and unto God, that which is God's. I represent Caesar, and I have the duty and responsibility, as you do, to follow the instructions given to you by the Court and that codified by the State of Tennessee, and I suggest to you and I tell you, and I know you'll follow that law and instructions given to you by the Court.
>
> . . . .
>
> If you vote – And I think it's appropriate, and I'm asking you based upon the law and the evidence to impose the death penalty in this case. You're not putting the Defendant to death. Don't go for that trip. I'm not putting that Defendant to death. The State of Tennessee is not putting that Defendant to death. His actions, his conduct, his repeated conduct is such that makes him responsible for his own conduct and the consequences of that conduct. There's a part of that conduct, deliberate, premeditated. The one that Sydney wrote about, that "My mama is in heaven, an angel," and the one the death angel wrote about that's contained by the State of Tennessee in the law and evidence that will be instructed to you about aggravating circumstances.
>
> . . . .
>
> . . . It's been difficult. It's difficult for me to make the decision that I thought this was appropriate, but I did much the same, based upon the information provided by the angel of death, that delineate and record and file the aggravating circumstances.

The defendant argues that these comments "misled the jury into feeling less responsible than it should have been for the sentencing decision it had to make" and violated the principles established by the Supreme Court in Caldwell v. Mississippi, 472 U.S. 320, 105 S. Ct. 2633 (1985).

In Caldwell, the prosecutor argued that the jury's decision to impose the death penalty "is not the final decision. . . . Your job is reviewable. . . . [T]he decision you render is automatically

---

[3]Although the defendant failed to object during closing argument, he raised the issue in his motion for new trial.

reviewable by the Supreme Court."  472 U.S. at 325-26, 105 S. Ct. at 2637-38.  The High Court held that "it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere."  Id. at 328-29, 105 S. Ct. at 2639.  In the later case of Romano v. Oklahoma, 512 U.S. 1, 9, 114 S. Ct. 2004, 2010  (1994), the United States Supreme Court noted that it had:

> read Caldwell as "relevant only to certain types of comment-those that mislead the jury as to its role in the sentencing process in a way that allows the jury to feel less responsible than it should for the sentencing decision." Darden v. Wainwright, 477 U.S. 168, 184, n.15, 106 S. Ct. 2464, 2473, n.15 (1986).  Thus, "[t]o establish a Caldwell violation, a defendant necessarily must show that the remarks to the jury improperly described the role assigned to the jury by local law." Dugger v. Adams, 489 U.S. 401, 407, 109 S. Ct. 1211, 1215 (1989); see also Sawyer v. Smith, 497 U.S. 227, 233, 110 S. Ct. 2822, 2826-2827 (1990).

In the present case, the prosecutor used phrases such as "[d]efense counsel would talk about the guilt trip he's putting on you with God and judgment"; "[y]ou're not putting the Defendant to death"; "[d]on't go for that trip"; "I'm not putting that Defendant to death"; "[t]he State of Tennessee is not putting that Defendant to death"; and "[h]is actions, his conduct, his repeated conduct is such that makes him responsible for his own conduct and the consequences of that conduct."  We agree that these statements could, arguably, be read as an attempt by the prosecutor to diminish in the eyes of the jury its responsibility in imposing the death penalty. Similar statements, such as "keep in mind, you don't impose the sentence, the law provides the sentence," State v. West, 767 S.W.2d 387, 399 (Tenn. 1989), and "[the defendant] is responsible for her death, no one else," and "it is she, the defendant, that has signed her own death warrant," Buttrum v. Black, 721 F. Supp. 1268, 1316 n.11 (N.D. Ga. 1989), have been construed as minimizing in the jury's eyes its role in imposing the death penalty.

However, when reviewing the propriety of argument in a capital sentencing proceeding, the ultimate question we must consider is whether the prosecutor's comments affected the sentencing decision.  State v. Irick, 762 S.W.2d 121, 131 (Tenn. 1988).  "If the Court cannot say the comments had no effect on the sentencing, then the jury's decision does not meet the standard of reliability required by the Eighth Amendment."  Id. (citing Caldwell, 472 U.S. 320, 105 S. Ct. at 2646).  The prosecutor's comments must be evaluated in the context of the total argument by the parties and, of course, the trial court's instructions to the jury about its obligations under the law.  See State v. Bush, 942 S.W.2d 489, 517 (Tenn. 1997); State v. Nichols, 877 S.W.2d 722, 733 (Tenn. 1994).  Additional factors that we consider in reviewing this issue include whether the trial court endorsed the improper remarks and whether other portions of the prosecutor's argument properly set forth the jury's role.

Applying the above principles, we note that the prosecutor did not refer the jury to another authority as the one having the final say in the death sentence.  We further note that this court has previously concluded that a similar comment by a prosecutor "could be construed to

have violated the dictates of Caldwell," but also could "just as easily be interpreted as an expression of the appellant's burden of responsibility for his own actions." State v. James Blanton, No. 01C01-9307-CC-00218, 1996 WL 219609, at *35 (Tenn. Crim. App., at Nashville, Apr. 30, 1996), aff'd, 975 S.W.2d 269 (Tenn. 1998). Moreover, the trial court did not endorse the improper remarks, and it properly instructed the jury about its role according to the law. In light of the entire argument and the proof as a whole, we simply cannot conclude that the prosecutor's comments affected the jury's sentencing decision. The defendant is not, therefore, entitled to relief on this claim.

## 2. Inflammatory Remarks During Closing Argument

The defendant next contends that the prosecutor made various inflammatory comments during closing argument. Specifically, he cites as error the prosecutor's repeated references to the angel of death, as well as his reference to God and Judgment, Caesar and himself. The State responds by arguing that the defendant has waived appellate review of any challenge to the prosecutor's statement by not raising a contemporaneous objection at trial. See Tenn. R. Crim. P. 33, 36(a). The State further argues that the defendant has failed to establish that this court should review the claims under plain error as he has not met his burden of demonstrating that any alleged error affected the outcome of the trial proceedings.

Although the defendant raised the issue in his motion for new trial, he failed to make a contemporaneous objection at trial. The failure to object to closing argument at trial waives our consideration of this issue on appeal. See Tenn. R. App. P. 36(a) (providing that relief is not required for a party who failed to take reasonably available action to prevent or nullify an error); State v. Stephenson, 195 S.W.3d 574, 601 (Tenn. 2006); State v. Thomas, 158 S.W.3d 361, 413 (Tenn. 2005); State v. Little, 854 S.W.2d 643, 651 (Tenn. Crim. App. 1992) (holding that the defendant's failure to object to the State's alleged misconduct during closing argument waives that issue). Thus, the defendant is not entitled to relief on appeal unless the remarks constitute "plain error." See Tenn. R. App. P. 36(b); Tenn. R. Crim. P. 52(b); State v. Smith, 24 S.W.3d 274, 282 (Tenn. 2000).

In determining whether an alleged trial error constitutes "plain error," we consider five factors: (1) the record must clearly establish what occurred at trial; (2) a clear and unequivocal rule of law must have been breached; (3) a substantial right of the defendant must have been adversely affected; (4) the defendant did not waive the issue for tactical reasons; and (5) consideration of the error is "necessary to do substantial justice." See State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994). Ultimately, the error must have "had an unfair prejudicial impact which undermined the fundamental fairness of the trial." Id. at 642.

The record in this case clearly establishes what occurred at trial. During closing argument, defense counsel quoted a passage from Shakespeare's The Merchant of Venice about the power of mercy, which included the line "earthly power shows most like God's when mercy seasons justice." The prosecutor responded by telling the jury that "what takes care and addresses that argument by defense counsel, is rendering unto Caesar that which is Caesar's and

-34-

unto God that which is God's. I represent Caesar." The prosecutor also referred numerous times to the "angel of death" during closing argument, suggesting to the jury a scenario in which the "angel of death" was present at the crime scene to witness the shootings and to record each aggravating circumstance associated with the murders.

Trial courts have substantial discretionary authority in determining the propriety of final argument. State v. McCary, 119 S.W.3d 226, 252-53 (Tenn. Crim. App. 2003). Although counsel is generally given wide latitude, courts must restrict any improper argument. Id. (citing Sparks v. State, 563 S.W.2d 564 (Tenn. Crim. App. 1978)). Generally speaking, closing argument "'must be temperate, must be predicated on evidence introduced during the trial of the case, and must be pertinent to the issues being tried.'" Id. at 252 (quoting State v. Sutton, 562 S.W.2d 820, 823 (Tenn. 1978)). To merit a new trial, the argument must be so inflammatory or improper as to affect the verdict. Id. at 253 (citing Harrington v. State, 215 Tenn. 338, 385 S.W.2d 758 (1965)). We have recognized five general areas of prosecutorial misconduct in closing argument: (1) intentionally misstating the evidence or misleading of the jury on the inferences it can draw; (2) expressing personal beliefs or opinions; (3) inflaming or attempting to inflame the passions or prejudices of the jury; (4) adding outside issues to the guilt or innocence issue; and (5) arguing or referring to outside facts. State v. Goltz, 111 S.W.3d 1, 5-6 (Tenn. Crim. App. 2003).

Tennessee Rule of Criminal Procedure 29.1(b) allows a closing argument to address any evidence introduced at trial. In addition to addressing the evidence, parties may also argue "reasonable inferences." State v. Chico McCracken, No. W2001-03176-CCA-R3-CD, 2003 WL 1618082, at *8 (Tenn. Crim. App., at Jackson, Mar. 24, 2003), perm. to appeal denied (Tenn. Sept. 2, 2003). When there is improper argument, the court must determine whether the inflammatory statement negatively impacted the defendant. To measure this impact, five factors should be considered: (1) the facts and circumstances of the case; (2) any curative measures undertaken by the court and the prosecutor; (3) the intent of the prosecution; (4) the cumulative effect of the improper conduct and any other errors in the record; and (5) the relative strength or weakness of the case. Goltz, 111 S.W.3d at 5-6 (citing Judge v. State, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976)).

In our view, the prosecutor's reference to the Biblical quotation about rendering unto Caesar that which is Caesar's was an acceptable response to defense counsel's argument that the jury should show the defendant mercy. The prosecutor began by reminding the jurors that they had agreed to follow the law and the instructions of the court and then launched into the quotation without specifically identifying it as a Biblical verse.[4] We believe that the prosecutor's

---

[4]The quotation comes from the book of Matthew, chapter 22, verse 21.

remarks permissibly sought to differentiate between God's laws and man's laws, so as to counter the argument made by defense counsel regarding God's mercy.[5]

The prosecutor's lengthy tirade about the angel of death's having recorded the defendant's deeds, however, is a completely different matter. The depiction of the angel of death attending and witnessing the murders, which was certainly not based on any evidence presented at trial, clearly constituted improper inflammatory remarks designed to incite the religious fervor and passion of the jury. Nonetheless, in light of the overwhelming evidence of the defendant's guilt, we cannot conclude that a substantial right of the defendant was adversely affected or that consideration of the issue is necessary to do substantial justice in this case. Therefore, while we do not condone the prosecutor's use of such language, we find the error to be harmless. See Tenn. R. App. P. 36(b); Tenn. R. Crim. P. 52(a).

The defendant also finds fault with the prosecutor's alleged "belittling [of] the mitigating factors." Specifically, he challenges the following:

> What mitigating factors is he pointing to? He expresses remorse. That doesn't make this any better. That doesn't make those three people any less dead. That doesn't take away from the pain and suffering of Larry Taylor and James Goff. "I'm sorry" just won't cut it. That's not going to mitigate the seriousness of this offense and what has happened out there at the TDOT facility. Saying I'm sorry is just not going to get it.

> Now I know his children love him. I would expect that from his children. That doesn't make this any better. Most people's children love them, but that doesn't mean that these three people are any less dead, and that does not mean that these people aren't suffering just the same. That doesn't make it any better. That doesn't make it anymore understandable. It has absolutely nothing to do with what happened out there.

> He adjusted well to prison life. That doesn't make this any better. He might live on in prison. That doesn't weigh anything. That doesn't make this anymore understandable.

---

[5] The quotations read by defense counsel during closing argument included the following:

> It is twice blessed. It blesses him that gives and him that receives.
> It's mightiest in the mighty. It becomes the throned monarch better than His crown. His scepter shows the force of earthly power, the tribute to His awe and majesty.
> Wherein doth sit the dread and fear of kings. But mercy is above this sceptered way. . . . It is a tribute to God Himself.
> Earthly power shows most like God's when mercy seasons justice.

Well let me tell you what weighs heavily against all of those mitigating factors in this case. That this Defendant left his house that morning with the intent of murdering his wife in cold blood, and it had special meaning to him because he was gonna do it with her brother's gun. He had a special purpose there to make sure that when she turned around after being shot in the leg, she knew she was dying with her brother's gun. That's what's weighty in this case.

We conclude that the prosecutor's statements regarding the mitigating factors went to the weight that should be given to each mitigating factor and, as such, were proper. The defendant, therefore, is not entitled to relief on this claim.

### 3. Destruction of Urine and Blood Samples

The defendant claims that his rights to a reliable sentencing determination, as well as his rights to confrontation, due process, and to present a defense, were violated by the State's destruction of urine and blood samples. The defendant asserts that the question of premeditation and issues regarding sentencing and mitigation were directly affected by his mental state and involved what effects alcohol and drugs could have had on that mental state. The defendant contends as constitutional error the fact that the Tennessee Bureau of Investigation destroyed the blood and urine samples which rendered them unavailable for further testing and made it impossible to accurately judge his alcohol and blood content through separate analysis.

In State v. Ferguson, 2 S.W.3d 912, 914 (Tenn. 1999), the Tennessee Supreme Court addressed the issue as to what factors guide the determination of the consequences that flow from the State's loss or destruction of evidence which the accused contends would be exculpatory. The supreme court answered that the critical inquiry was whether a trial, conducted without the destroyed evidence, would be fundamentally fair. Id. In reaching its decision, the Ferguson court noted that its inquiry was distinct from one under Brady v. Maryland, 373 U.S. 83, 87, 83 S. Ct. 1194, 1196 (1963), and United States v. Agurs, 427 U.S. 97, 110-11, 96 S. Ct. 2392, 2401 (1976), because those two cases addressed "plainly exculpatory" evidence, while Ferguson addressed a situation "wherein the existence of the destroyed videotape was known to the defense but where its true nature (exculpatory, inculpatory, or neutral) can never be determined." 2 S.W.3d at 915.

The court went on to explain that the first step in the analysis is determining whether the State had a duty to "preserve" the evidence. Id. at 917. "Generally speaking, the State has a duty to preserve all evidence subject to discovery and inspection under Tenn. R. Crim. P. 16, or other applicable law." Id. (footnote omitted). However,

"[w]hatever duty the Constitution imposes on the States to preserve evidence, that duty must be limited to evidence that might be expected to play a significant role in the suspect's defense. To meet this standard of constitutional materiality, evidence must both possess an exculpatory value that was apparent before the

-37-

> evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means."

Id. (quoting California v. Trombetta, 467 U.S. 479, 488-89, 104 S. Ct. 2528, 2533-34 (1984)). Only if the proof demonstrates the existence of a duty to preserve and further shows that the State has failed in that duty must a court turn to a balancing analysis involving consideration of the following factors: "1. The degree of negligence involved; 2. The significance of the destroyed evidence, considered in light of the probative value and reliability of secondary or substitute evidence that remains available; and 3. The sufficiency of the other evidence used at trial to support the conviction." Id. (footnote omitted).

The record reflects that the defendant's blood and urine samples were taken on January 11, 2005, and destroyed on January 3, 2006. Between the offense date and the time the samples were destroyed, the defendant failed to file a motion to preserve the evidence. During the trial, the defense presented the testimony of Special Agent John W. Harrison, an analytical toxicologist with the TBI. Special Agent Harrison testified that the result of the defendant's urine test was .17, a reading reflecting the consumption of alcohol. TBI Agent Kelly Hopkins testified that the defendant's urine was positive for Citalopram and Benzodiazepines. Special Agent Harrison also testified extensively as to the metabolism of alcohol.

First, the State is not required to preserve samples taken for the limited purpose of determining the defendant's blood-alcohol level. See Trombetta, 467 U.S. at 491, 104 S. Ct. at 2535. It is common knowledge that human blood is perishable, and specimens of blood can only be maintained for a short period of time. Also, such evidence would not be expected to play a significant role in the accused's defense. Id. Moreover, it appears from the record that the TBI acted in good faith and apparently destroyed the blood specimen in conformity with the established procedures of the laboratory. State v. Brownell, 696 S.W.2d 362, 363-64 (Tenn. Crim. App. 1985); State v. Dowell, 705 S.W.2d 138, 141-42 (Tenn. Crim. App. 1985). The evidence did not possess any exculpatory value that was apparent prior to its destruction, as the test results were available. Accordingly, the TBI had no duty to preserve the evidence beyond its established procedures. Moreover, even if the State had a duty to preserve the blood sample and failed to do so, the defendant has failed to demonstrate that his right to a fair trial was affected by the destruction of the evidence. See Ferguson, 2 S.W.3d at 917. "[T]he mere loss or destruction of evidence does not constitute bad faith." Edward Thompson v. State, No. E2003-01089-CCA-R3-PC, 2004 WL 911279, at *2 (Tenn. Crim. App. Apr. 29, 2004), perm. to appeal denied (Tenn. Oct. 4, 2004).

The second factor is the significance of the missing evidence. The defendant has not offered any proof that the State acted improperly in collecting or testing his blood. It is undisputed that the defendant consented to have his blood drawn and the specimen provided to the officer for the purpose of drug and alcohol testing. At trial, the defendant presented the testimony of Special Agent Harrison, as we have stated, and there was no evidence of tampering

-38-

prior to testing. The defendant has failed to offer any evidence that the test results reported by Agent Harrison do not accurately reflect the contents of his blood and urine.

Finally, because there is no indication that additional testing of the defendant's blood and urine would have yielded results different from those found by the TBI, it cannot be said that evidence critical to the defense was excluded. Moreover, as it was the defendant who introduced the test results at trial, he cannot complain that he was deprived of his right to present a defense. The defendant is not entitled to relief on this claim.

### D. Improper Victim Impact Evidence

The defendant contends that the number of victim impact witnesses was excessive. In this regard, the defendant complains that Renee Dawson should not have testified because she was not a member of the victim's immediate family.

Six witnesses testified to victim impact evidence: Donald Roberson (Renee Jordan's father), Emma Hopper (Jerry Hopper's wife), Misty Ellis (Jerry Hopper's daughter), Robert E. Lee Gordon, Jr. (David Gordon's brother), Shane Gordon (David Gordon's son), and Renee Dawson (David Gordon's fiancée). The defendant complains that there is no provision in Tennessee Code Annotated section 39-13-204(c) for a friend of the victim to testify. In this regard, he asserts that Renee Dawson's testimony should have been excluded. The defendant also contends that having the brother, the son, and the fiancée of David Gordon testify was an excessive number of witnesses for victim impact and prejudiced the jury.

Neither the United States Constitution nor the Tennessee Constitution prohibits the use of victim impact evidence in a capital sentencing proceeding. State v. McKinney, 74 S.W.3d 291, 308-09 (Tenn. 2002) (citing Payne v. Tennessee, 501 U.S. 808, 827, 111 S. Ct. 2597, 2609 (1991)). However, the introduction of such evidence is not unrestricted. State v. Berry, 141 S.W.3d 549, 589 (Tenn. 2004). "Victim impact evidence may not be introduced if (1) it is so unduly prejudicial that it renders the trial fundamentally unfair, or (2) its probative value is substantially outweighed by its prejudicial impact." Id. (citing State v. Nesbit, 978 S.W.2d 872, 891 (Tenn. 1998)). Our supreme court has provided guidance as to the nature and extent of evidence that may be admitted as "victim impact" evidence:

> Generally, victim impact evidence should be limited to information designed to show those unique characteristics which provide a brief glimpse into the life of the individual who has been killed, the contemporaneous and prospective circumstances surrounding the individual's death, and how those circumstances financially, emotionally, psychologically or physically impacted upon members of the victim's immediate family.

Nesbit, 978 S.W.2d at 891 (citations and footnote omitted); see also State v. Reid, 91 S.W.3d 247, 280 (Tenn. 2002). "[T]here is no bright-line test, and the admissibility of specific types of

victim impact evidence must be determined on a case-by-case basis." <u>Nesbit</u>, 978 S.W.2d at 891. However, "such evidence . . . should be closely scrutinized and restrained so as not to be unduly prejudicial or appeal to the emotions or sympathies of the jury." <u>McKinney</u>, 74 S.W.3d at 309.

The defendant first complains that the victim impact evidence related to David Gordon was excessive because three witnesses testified as to the impact of his murder on their lives. David Gordon's brother testified as to how Gordon's death had impacted him and his nephews and said that Gordon was a hard worker and good father. Gordon's son testified as to how his father's death had impacted him and Gordon's grandson. He also testified that Gordon was a hard worker and a good father. Gordon's fiancée testified that Gordon was her best friend and related how his death had impacted her. The victim impact evidence was limited to the victim's role as brother, father, and fiancée. This evidence is of the nature contemplated by <u>Nesbit</u>. We cannot conclude that the victim impact evidence in this case was cumulative, unduly prejudicial, or that its probative value did not substantially outweigh any prejudicial impact.

The defendant additionally challenges the propriety of permitting Renee Dawson to testify because she was David Gordon's fiancée, and not a family member as contemplated by Tennessee Code Annotated section 39-13-204(c), which provides in relevant part:

> The court shall permit a member or members, or a representative or representatives of the victim's family to testify at the sentencing hearing about the victim and about the impact of the murder on the family of the victim and other relevant persons. The evidence may be considered by the jury in determining which sentence to impose. The court shall permit members or representatives of the victim's family to attend the trial, and those persons shall not be excluded because the person or persons shall testify during the sentencing proceeding as to the impact of the offense.

Tenn. Code Ann. § 39-13-204(c). We note that the Victims' Bill of Rights contemplates that a person residing with a deceased victim may exercise the victim's rights. <u>See</u> Tenn. Code Ann. § 40-38-302(4)(A)(iii)(b). While section 39-13-204 does not specifically designate a fiancée as one of the family members encompassed as one impacted by the death of a victim, this court concludes that our legislature would not specifically exclude a fiancée of the victim, one who shared a home with the victim, as a person impacted by the victim's death. In this regard, we conclude that there was no error in admitting the testimony of Renee Dawson as victim impact evidence. The defendant is not entitled to relief in this regard.

### E. Felony Murder Aggravating Circumstance Jury Instruction

The defendant asserts that the jury instruction as to the felony murder aggravator improperly employed definitions in the listing of the aggravator, were overly broad, unconstitutionally vague, and reduced the burden of proof that should have been employed. The trial court provided the following definition as to the felony murder aggravating circumstance:

Number 4: The murder was knowingly committed, solicited, directed or aided by the Defendant while the Defendant had a substantial role in committing or attempting to commit first degree murder. Knowingly means that a person acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist. A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result. The requirement of knowingly is also established if it is shown that the Defendant acted intentionally.

Intentionally means that a person acts intentionally with respect to the nature of the conduct or to a result of the conduct when it is the person's conscious objective or desire to engage in the conduct or cause the results.

The defendant complains that the extensive instructions on "knowing" went beyond the language of the death penalty statute which simply lists the aggravator itself. The defendant adds that the extensive definition gave the jury much more "lee-way" to find the felony murder aggravator. It appears that the defendant complains that the addition of a definition of a legal term to an instruction on an aggravating factor amounts to an amendment of the aggravating factor. We disagree. We have reviewed the instruction and conclude that the instruction was not error.

**F. Introduction of Photographs**

The defendant argues that the photographs admitted during the penalty phase were "overly prejudicial and gruesome." Specifically, the defendant argues that exhibit 141, a photograph of the TDOT office depicting blood in the corner was "gruesome and prejudicial." Without singling out any of the other photographic exhibits, the defendant argues, without elaboration, that they are "overly prejudicial and gruesome."

Before entry into evidence of the photographs that the defendant argues were prejudicial, the trial court conducted a lengthy hearing, during which the court examined each of the photographs which the State sought to enter, heard the arguments of counsel as to each photograph, and then ruled as to each photograph. As to all of the photographs, the State explained what each depicted and its relevance to the State's burden of proof. The defense responded that, as to the injuries to the deceased victims, the autopsy reports sufficiently explained the nature and extent of the injuries so that the photographs, some of which defense counsel described as "gory," would prejudice the defendant.

As to the photographs of the deceased victim, David Gordon, the court required that the State remove several of the photographs intended to be entered into evidence and explained the relevance of the others:

I don't want any duplication on the Gordon photos. For example, the last two photos in the area that [defense counsel] was not certain if he was

pronouncing it right, take one or two of those out, and there might be one other one that shows the same thing. But definitely on the last two I want the State to make a decision.

I want to make it very clear that as I view the diagram referred to by [defense counsel], there's such a substantial difference in appreciating the type of injuries sustained in the diagram versus seeing in the photos, and again the Court finds that it is very probative in this case, and since we're at a sentencing hearing and the State's arguing certain aggravators, . . . probative value outweighs the prejudicial effect under these circumstances.

General, show us which one you're going to pull out. Take it out. And at the very first there might have been two that were somewhat of a duplication.

As to the two photographs of the wounded victim, David Goff, the court explained why these would be admitted:

Well[,] the aggravating factor [the prosecutor] stated was the Defendant knowingly created a great risk of death to two or more persons other than the victim murdered during the act of murder, and that's the one alluded to, and the State says this would be relevant to that particular aggravator.

Under the circumstances for again the reasons I stated earlier, I believe it would be appropriate because the State wants to use it toward the proof of aggravator. There are only two photos here.

The court explained why the two photographs of the wounded victim, Larry Taylor, would be admitted:

The Court's viewing those two photos of Larry Taylor. It's very limited photos in that there's a draping, a white cloth around each of the leg wounds. There is a small amount of blood on the white cloth, but it's certainly not grotesque or something that would in itself outrage the jury. Again, we're at a sentencing hearing, and since the State is wanting to use these two photos for the same reason, I'll stand on the basis I stated earlier when we first talked about photos and let those two photos be introduced at this time, but again, note [defense counsel] now raises the same objection that he stated when we began.

As to the photographs of the deceased victim, Donna Renee Jordan, the court determined that certain of the photographs would not be admitted because they were duplicative and required that portions of others be covered. The court allowed only one photograph of the victim's body at the crime scene and explained why others were admissible:

Again, under the Leach case, it was certainly made clear that certain photos might be very unpleasant, but again, we're dealing with the sentencing

phase, and we're dealing with the burden on the State. The jury has heard quite a bit of detail through the guilt phase before they found this Defendant guilty of first degree murder about what took place, the firing sequence. I just believe when you weigh probative and prejudicial in this case, again noting it's the sentencing phase, it's highly, highly probative as the aggravators that the State has pointed out and must prove. I'll allow the one photo in. And I'll note, this is the only one from the crime scene that the State is asking to show under these circumstances.

The admission of photographs is generally discretionary with the trial court and, absent an abuse of that discretion, will not result in the grant of a new trial. State v. Banks, 564 S.W.2d 947, 949 (Tenn. 1978). However, a photograph must be relevant to an issue that the jury must decide before it may be admitted into evidence. State v. Vann, 976 S.W.2d 93, 102 (Tenn. 1998); State v. Braden, 867 S.W.2d 750, 758 (Tenn. Crim. App. 1993); see also Tenn. R. Evid. 401, 402. Evidence that is not relevant to prove some part of the prosecution's case should not be admitted solely to inflame the jury and prejudice the defendant. Additionally, the probative value of the photograph must outweigh any unfair prejudicial effect that it may have upon the trier of fact. Vann, 976 S.W.2d at 102-03; see also Tenn. R. Evid. 403 ("Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice[.]").

While it can be said that photographs of crime victims who suffer serious bodily injury are prejudicial by their very nature, a prejudicial photograph is not *per se* excludable. What is excluded is evidence which is unfairly prejudicial, in other words, evidence which has an undue tendency to suggest a decision on an improper basis, frequently, though not necessarily, an emotional one. Banks, 564 S.W.2d at 951.

Exhibit 141 is a photograph of the crime scene which shows a puddle of blood on the floor and Renee Jordan's arm. The trial court determined that the photograph was relevant and not prejudicial. We agree. Moreover, this court cannot conclude that Exhibit 141 was particularly gruesome or inflammatory. Thus, we conclude that the probative value of the photograph is not outweighed by its prejudicial effect, and the trial court did not abuse its discretion in allowing its admission. Further, it does not affirmatively appear that the "admission of the photograph[ ] has affected the results of the trial." See Banks, 564 S.W.2d at 953. The defendant is not entitled to relief on this issue.

As to the remaining photographs which are not specifically challenged on appeal, this court takes notice of the following proceedings in the trial court. See Tenn. R. App. P. 27. Out of the presence of the jury, the prosecution revealed to the trial court the collective photographs it planned to introduce during the penalty phase. The first set of photographs was described as follows:

1. A photograph of David Gordon, post-mortem, showing an abrasion to the right side of his forehead taken at the medical examiner's office.

-43-

2.  A photograph of David Gordon on a table showing injuries to his right arm and right abdomen.  A surgical scar is also visible.

3.  A photograph of David Gordon revealing in detail impact of a wound resulting from asphalt. The photograph also shows injuries to the abdomen, showing the gunshot wounds.

4.  A photograph of the right hip area of David Gordon showing gunshot wounds and also evidence of an intermediate target striking his legs.

5.  A photograph of David Gordon showing injury to the left abdomen, showing approximately three gunshot wounds.  Also, there is evidence of surgical scars present in the photograph.

6.  A photograph of David Gordon's buttocks' region, showing in detail the gunshot wounds.  Also visible are wounds to the left hip and left torso area.

7.  A photograph of David Gordon's buttocks' region.  Also visible are wounds to the right hip and upper right thigh.

8.  A photograph showing a close-up of the wounds of David Gordon showing injuries to the peritoneum, the area between the scrotum and the rectum.

Defense counsel objected to this set of photographs stating that "some of these photographs are quite gory."  A specific complaint was made to the photograph of David Gordon's peritoneum. In reviewing this set of photographs, the trial court determined that the photographs were probative in regards to establishing the type of injuries sustained.  In this regard, the lower court found that the probative value outweighed the prejudicial effect.

A second set of photographs was described as follows: "photograph taken at the ER showing James Goff, and particularly the injury to his submandibular region."  The defendant objected to this set of photographs, stating that the photographs were not those of the deceased. He added that it was prejudicial and improper to show a photograph of a wounded person to the jury in this case.  The trial court determined that the photograph was relevant to the State's alleged aggravator that the defendant knowingly created a great risk of death to two or more persons other than the victim murdered.

A third set of photographs depicted injuries sustained to Larry Taylor.  The trial court determined that the photograph was relevant to the State's alleged aggravator that the defendant knowingly created a great risk of death to two or more persons other than the victim murdered.

A fourth set of photographs was described as follows:

1.  A photograph of Renee Jordan showing the gunshot wound to the forehead.

2. A photograph of Renee Jordan depicting the entry wound to the back of the head.

3. A photograph of Renee Jordan depicting an exit wound to the face, specifically the side of the nostril.

4. A photograph of Renee Jordan depicting the entrance wound to the forehead and the exit wound.

5. A photograph of the total body of Renee Jordan depicting multiple bullet wounds to the abdomen and right breast.

6. A close-up shot of Renee Jordan's breast.

Reviewing the photographs, the trial court removed duplicitous photographs and determined that the photographs were admissible in support of the aggravators alleged by the State.

Additionally, a photograph showing Renee Jordan at the scene lying on the floor with blood surrounding her head was admitted. The trial court determined that the photograph was highly probative of the aggravators alleged by the State.

Photographs of a corpse are admissible in murder prosecutions if they are relevant to the issues at trial, notwithstanding their gruesome and horrifying character. See Banks, 564 S.W.2d at 950-51. In this respect, photographs of murder victims are prejudicial by their very nature. However, prejudicial evidence is not excludable *per se.* If this were true, all evidence of a crime would be excluded at trial. Rather, what is excluded is evidence which is unfairly prejudicial, in other words, evidence which has an undue tendency to suggest a decision on an improper basis, frequently, though not necessarily, an emotional one. Id. at 951.

The photographs admitted by the trial court were relevant to supplement the testimony of the medical examiner and to support the aggravating circumstances alleged by the State. See, generally, State v. Cole, 155 S.W.3d 885, 913 (Tenn. 2005) (Appendix). We conclude that the probative value of the photographs was not outweighed by their prejudicial effect, and the trial court did not abuse its discretion in allowing their admission. Further, it does not affirmatively appear that the "admission of the photographs has affected the results of the trial." See Banks, 564 S.W.2d at 953. The defendant is not entitled to relief on this issue.

## G. Jury Instruction as to Aggravators and Mitigators

The defendant contends that it was a violation of his right to a jury trial under both the Tennessee and United States Constitutions and to a reliable result under the Eighth Amendment for the jury to be instructed that "if aggravators outweigh mitigators beyond a reasonable doubt, the sentence shall be death." In the defendant's view, this instruction removes jury discretion in the sentencing decision. This argument was addressed and rejected in State v. Boyd, 797 S.W.2d

589, 596 (Tenn. 1990), where our supreme court found that "[t]here is no likelihood that this statutory language imposes a 'presumption of death.'" See State v. Howell, 868 S.W.2d 238, 258 (Tenn. 1993); State v. Wright, 756 S.W.2d 669, 674 (Tenn. 1988); State v. Teague, 680 S.W.2d 785, 790 (Tenn. 1984). Accordingly, the defendant is not entitled to relief on this issue.

## H. Sufficiency of Aggravating Circumstances

The defendant attacks the sufficiency of the evidence to support the aggravating circumstances found by the jury as to the murders of Renee Jordan, Jerry Hopper, and David Gordon. Within his argument, the defendant not only challenges the sufficiency of the evidence of the aggravating circumstances but also asserts the application of some aggravating circumstances was duplicitous and inconsistent.

### 1. Renee Jordan

As to the murder of Renee Jordan, the jury found the presence of five aggravating circumstances:

(a) The defendant knowingly created a great risk of death to two or more persons, other than the victim murdered, during the act of murder. Tenn. Code Ann. § 39-13-204(i)(3).

(b) The murder was especially heinous, atrocious, or cruel, in that it involved torture or serious physical abuse beyond that necessary to produce death. Tenn. Code Ann. § 39-13-204(i)(5).

(c) The murder was knowingly committed, solicited, directed, or aided by the defendant while the defendant had a substantial role in committing or attempting to commit first degree murder. Tenn. Code Ann. § 39-13-204(i)(7).

(d) The defendant committed "mass murder" which is defined as the murder of three or more persons, whether committed during a single criminal episode or at different times within a 48-month period. Tenn. Code Ann. § 39-13-204(i)(12).

(e) The defendant knowingly mutilated the body of the victim after death. Tenn. Code Ann. § 39-13-204(i)(13).

"In determining whether the evidence supports the jury's findings of statutory aggravating circumstances, we view the evidence in a light most favorable to the State and ask whether a rational trier of fact could have found the existence of the aggravating circumstances beyond a reasonable doubt." State v. Rollins, 188 S.W.3d 553, 571 (Tenn. 2006) (citing State v. Reid, 164 S.W.3d 286, 314 (Tenn. 2005)).

### a. (i)(3) aggravator

The first aggravating circumstance the jury found was that the defendant knowingly created a great risk of death to two or more persons in the course of murdering the victim. See Tenn. Code Ann. § 39-13-204(i)(3). Our supreme court has previously held that this aggravating circumstance "'contemplates either multiple murders or threats to several persons at or shortly prior to or shortly after an act of murder upon which the prosecution is based.'" Johnson v. State, 38 S.W.3d 52, 60 (Tenn. 2001) (quoting State v. Cone, 665 S.W.2d 87, 95 (Tenn. 1984)). "Most commonly, this aggravating circumstance 'has been applied where a defendant fires multiple gunshots in the course of a robbery or other incident at which persons other than the victim are present.'" Id. (quoting State v. Henderson, 24 S.W.3d 307, 314 (Tenn. 2000)). "In many of the cases upholding application of the (i)(3) aggravator, the defendant fired random shots with others present or nearby, the defendant engaged in a shootout with other parties, or the defendant actually shot people in addition to the murder victim." Id. at 60-61 (footnotes omitted). We conclude that the proof was more than sufficient to support application of the (i)(3) factor.

### b. (i)(5) factor

The jury also found that the murder was "especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death." Tenn. Code Ann. § 39-13-204(i)(5). This aggravating circumstance may be applied if the evidence is sufficient to support *either* torture *or* serious physical abuse beyond that necessary to produce death. State v. Suttles, 30 S.W.3d 252, 262 (Tenn. 2000).

Our supreme court has defined "serious physical abuse beyond that necessary to produce death" as follows:

> The word "serious" alludes to a matter of degree. The abuse must be physical, as opposed to mental, and it must be "beyond that" or more than what is "necessary to produce death." "Abuse" is defined as an act that is "excessive" or which makes "improper use of a thing," or which uses a thing "in a manner contrary to the natural or legal rules for its use."

State v. Odom, 928 S.W.2d 18, 26 (Tenn. 1996) (quoting Black's Law Dictionary 11 (6th ed. 1990)). By the defendant's confession, he first shot Renee Jordan in the leg to attract her attention. He then shot James Goff. The defendant then turned to Larry Taylor and told him to get out of the office. Renee Jordan suffered numerous other gunshot wounds to her head and at least nine bullet wounds to her torso. The wounds to the victim's head were fatal. Clearly, there was more injury to the victim beyond that necessary to produce death. The proof is more than sufficient to support the jury's finding of this aggravating circumstance.

### c. (i)(7)

The defendant asserts that there is no evidence to support the felony murder aggravator as to the murder of Renee Jordan. Specifically, he asserts that because the wound to the victim's forehead would have been immediately fatal, it is apparent that she was murdered before the other victims were killed. The (i)(7) aggravating factor requires evidence that "[t]he murder was knowingly committed, solicited, directed, or aided by the defendant, while the defendant had a substantial role in committing or attempting to commit . . . any first degree murder[.]" Tenn. Code Ann. § 39-13-204(i)(7). The defendant's own statement supports the application of this factor. The defendant stated that he shot Renee Jordan first in the leg. He then shot James Goff. The defendant told Larry Taylor that he could leave the room. He then continued shooting. The proof clearly established that Renee Jordan was killed "while" the defendant was committing other murders.

### d. (i)(12)

In State v. Reid, 213 S.W.3d 792, 819 (Tenn. 2006), our supreme court acknowledged that for this factor to apply, "'the State must show beyond a reasonable doubt (1) that the defendant had been *convicted* of three or more murders, including the one for which he has just been tried, (2) within the State of Tennessee, (3) within a period of forty-eight (48) months, (4) perpetrated in a similar fashion, and (5) in a common scheme or plan.'" Id. (quoting Black, 815 S.W.2d at 183). As the Reid court acknowledged, the application has been approved in a case where the defendant shot his four children in the garage of his residence, see State v. Holton, 126 S.W.3d 845, 865 (Tenn. 2004); in a case where the defendant stabbed, shot, and disemboweled his estranged wife and her two children, see Smith, 868 S.W.2d at 582; in a case where the defendant killed his girlfriend and her children, see Black, 815 S.W.2d at 184; in a case where the defendant killed three people during the robbery of a restaurant, see State v. Van Tran, 864 S.W.2d 465, 478 (Tenn. 1993); and in a sentence of life without parole where the defendants killed three members of the same family at a rest stop, see State v. Howell, 34 S.W.3d 484, 509 (Tenn. Crim. App. 2000). In the instant case, the defendant shot and killed Renee Jordan, Jerry Hopper, and David Gordon at the TDOT garage in Jackson, Tennessee, on January 11, 2005. The facts of these murders satisfy the application of the mass murder aggravating factor.

### e. (i)(13)

The jury found that the defendant knowingly mutilated the victim's body after death. This court has held that the term "mutilation" is broadly defined and encompasses "to cut up or alter radically so as to make imperfect." State v. Thompson, 43 S.W.3d 516, 526 (Tenn. Crim. App. 2000); see Merriam-Webster's Collegiate Dictionary, 768 (10th ed. 1994); Webster's Third New International Dictionary, 1493 (1993)). Indeed, this court has previously stated that the legislative intent underlying mutilation as an aggravating circumstance must be "that the General Assembly . . . meant to discourage corpse desecration." State v. Price, 46 S.W.3d 785, 828 (Tenn. Crim. App. 2000). "Desecrate" is defined as: "1. To violate the sanctity of . . . 2. to treat disrespectfully, irreverently, or outrageously." Merriam-Webster's Collegiate Dictionary 312 (10th ed. 1994). The mutilation must occur after death. Dr. McMaster testified that there was no

indication in the autopsy of post-mortem wounds. However, lay testimony indicated that the defendant returned to the office with a different weapon, the assault rifle, and shot Renee Jordan additional times. The proof indicated that the wound to her forehead was fatal and that she would have died within thirty seconds of sustaining this wound. This wound was inflicted with a handgun. Accordingly, the proof supports the conclusion that the defendant returned and inflicted more gunshots to the victim's lifeless body. The evidence is sufficient to support application of the (i)(13) aggravating factor.

## 2. Jerry Hopper

As to the murder of Jerry Hopper, the jury found the presence of five aggravating circumstances:

(a) The defendant knowingly created a great risk of death to two or more persons, other than the victim murdered, during the act of murder. Tenn. Code Ann. § 39-13-204(i)(3).

(b) The murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant or another. Tenn. Code Ann. § 39-13-204(i)(6).

(c) The murder was knowingly committed, solicited, directed, or aided by the defendant while the defendant had a substantial role in committing or attempting to commit first degree murder. Tenn. Code Ann. § 39-13-204(i)(7).

(d) The defendant committed "mass murder" which is defined as the murder of three or more persons, whether committed during a single criminal episode or at different times within a forty-eight-month period. Tenn. Code Ann. § 39-13-204(i)(12).

### a. (i)(3) aggravator

The first aggravating circumstance the jury found was that the defendant knowingly created a great risk of death to two or more persons in the course of murdering the victim. See Tenn. Code Ann. § 39-13-204(i)(3). Upon review of the evidence in the instant case, we conclude that the proof was more than sufficient to support application of the (i)(3) factor.

### b. (i)(6)

The jury also found that the State had established that the defendant killed Jerry Hopper in order to avoid his arrest and prosecution. See Tenn. Code Ann. § 39-13-204(i)(6). This aggravating circumstance focuses on a defendant's motives in killing the victim. Reid, 164 at 315; Terry v. State, 46 S.W.3d 147, 162 (Tenn. 2001). Although there must be some "particular

proof" supporting this aggravating circumstance, State v. Hartman, 42 S.W.3d 44, 58 (Tenn. 2001), the State need not prove that the defendant's desire to avoid prosecution was his sole motive in murdering the victim. Terry, 46 S.W.3d at 162. This court cannot conclude that there is some "particular proof" supporting this aggravating circumstance. The defendant allowed other persons in the TDOT office to leave, specifically, Larry Taylor. He knew many of the persons by name, yet made no attempt to "stop" them to avoid his arrest. Accordingly, the proof is insufficient to support application of this factor as to Jerry Hopper.

### c. (i)(7)

The defendant asserts that there is no evidence to support the felony murder aggravator as to the murder of Jerry Hopper. The record clearly established that the murder of Jerry Hopper was committed while the defendant was committing the murder of Renee Jordan. The evidence supports the application of this aggravating factor.

### d. (i)(12)

In the instant case, the defendant shot and killed Renee Jordan, Jerry Hopper, and David Gordon at the TDOT garage in Jackson, Tennessee, on January 11, 2005. The facts of these murders satisfy the application of the mass murder aggravating factor.

### 3. David Gordon

As to the murder of David Gordon, the jury found the presence of five aggravating circumstances:

(a) The murder was especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death. Tenn. Code Ann. § 39-13-204(i)(5).

(b) The murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant or another. Tenn. Code Ann. § 39-13-204(i)(6).

(c) The murder was knowingly committed, solicited, directed, or aided by the defendant, while the defendant had a substantial role in committing or attempting to commit first degree murder. Tenn. Code Ann. § 39-13-204(i)(7).

(d) The defendant committed "mass murder" which is defined as the murder of three or more persons, whether committed during a single criminal episode or at

different times within a forty-eight-month period. Tenn. Code Ann. § 39-13-204(i)(12).

### a. (i)(5) factor

The jury found that the murder was "especially heinous, atrocious, or cruel, in that it involved torture or serious physical abuse beyond that necessary to produce death." Tenn. Code Ann. § 39-13-204(i)(5). This aggravating circumstance may be applied if the evidence is sufficient to support *either* torture *or* serious physical abuse beyond that necessary to produce death. Medical testimony at trial established that the number of wounds were more than that necessary to cause death. The testimony further established that the wounds sustained to David Gordon's buttocks and natal cleft were consistent with him being facedown on the pavement. The proof is more than sufficient to support the jury's finding of this aggravating circumstance.

### b. (i)(6)

The jury also found that the State had established that the defendant killed David Gordon in order to avoid his arrest and prosecution. See Tenn. Code Ann. § 39-13-204(i)(6). To support application of this factor, there must be some "particular proof" supporting this aggravating circumstance. The defendant shot Gordon outside the TDOT garage. There was obviously a confrontation between Gordon and the defendant. One bystander witnessed Gordon raise his hands before being shot by the defendant. This court cannot conclude that there is some "particular proof" supporting this aggravating circumstance. The defendant let other persons in the TDOT office go, specifically, Larry Taylor. He knew many of the persons by name, yet made no attempt to "stop" them to avoid his arrest. Accordingly, the proof is insufficient to support application of this factor as to David Gordon.

### c. (i)(7)

The defendant asserts that there is no evidence to support the felony murder aggravator as to the murder of David Gordon. The overwhelming proof at trial established that the murder of Gordon was committed while the defendant was committing the act of first degree murder. The evidence supports the application of this aggravating factor.

### d. (i)(12)

In the instant case, the defendant shot and killed Renee Jordan, Jerry Hopper, and David Gordon at the TDOT garage in Jackson, Tennessee, on January 11, 2005. The facts of these murders satisfy the application of the mass murder aggravating factor.

### 4. Double Counting

The defendant argues that the same proof and course of conduct were used to establish multiple overlapping aggravators. The defendant concedes that the "double counting" of facts used to establish aggravating factors is not prohibited in Tennessee. Indeed, in State v. Hall, 958 S.W.2d 679, 692 (Tenn. 1997), the Tennessee Supreme Court noted that there is no bar to the use of the same evidence to establish more than one aggravating circumstance. The court further noted that, in Hall, the same evidence had not been used to support both aggravators. A review of the facts used to support the aggravating circumstances fails to support the defendant's contention that the same facts were used to support the aggravating circumstances found. The defendant is not entitled to relief on this claim.

## I. Lethal Injection Unconstitutional

The defendant asserts that Tennessee's lethal injection procedure and protocol violates principles of cruel and unusual punishment. In support of his claim, the defendant relies upon the United States Supreme Court's grant of certiorari in Baze v. Rees, No. 07-5439 (U.S. Sept. 25, 2007) (granting review to determine the constitutionality of Kentucky's three-drug lethal injection protocol).

On April 16, 2008, the United States Supreme Court decided Baze v. Rees, upholding the State of Kentucky's lethal-injection protocol as not being violative of the Eighth Amendment. Baze v. Rees, 553 U.S. ___,128 S. Ct. 1520 (2008). The Supreme Court's plurality found that cruel and unusual punishment occurs where lethal injection as an execution method presents a "substantial" or "objectively intolerable risk of serious harm" in light of "feasible, readily implemented" alternative procedures. Id. at 1531-32. However, the analysis was focused on the manner of lethal injection. Id. at 1537. The Baze Court held:

> Kentucky has adopted a method of execution believed to be the most humane available, one it shares with 35 other States . . . [which] if administered as intended . . . will result in a painless death. The risks of maladministration . . . such as improper mixing of chemicals and improper setting of IVs by trained and experienced personnel - cannot remotely be characterized as "objectively intolerable." Kentucky's decision to adhere to its protocol despite these asserted risks, while adopting safeguards to protect against them, cannot be viewed as probative of the wanton infliction of pain under the Eighth Amendment.

Baze, 553 U.S. at ___, 128 S. Ct. at 1537-38.

For "the disposition of other cases uncertain," Chief Justice Roberts stated that "[a] State with a lethal injection protocol *substantially similar* to the protocol we uphold today would not create a risk that meets [the 'substantial risk'] standard." Id. at 1537 (emphasis added). The protocol adopted in Kentucky involves the combination of three drugs: the first, sodium thiopental, induces unconsciousness when given in the specified amounts and thereby ensures that the prisoner does not experience any pain associated with the paralysis and cardiac arrest caused by the second and third drugs, pancuronium bromide and potassium chloride.

Among other things, Kentucky's lethal injection protocol reserves to qualified personnel having at least one year's professional experience the responsibility for inserting the intravenous (IV) catheters into the prisoner, leaving it to others to mix the drugs and load them into syringes; specifies that the warden and deputy warden will remain in the execution chamber to observe the prisoner and watch for any IV problems while the execution team administers the drugs from another room; and mandates that if, as determined by the warden and deputy, the prisoner is not unconscious within 60 seconds after the sodium thiopental's delivery, a new dose will be given at a secondary injection site before the second and third drugs are administered.

Baze, 553 U.S. at ___, 128 S. Ct. at 1522. Tennessee has adopted a three-drug protocol for lethal injection similar to that of Kentucky. See, e.g., Baze, 553 U.S. at ___, 128 S. Ct. at 1527; Workman v. Bredesen, 486 F.3d 896, 902 (6th Cir. 2007); Abdur'Rahman v. Bredesen, 181 S.W.3d 292, 314 (Tenn. 2005). Therefore, we are unable to conclude that Tennessee's lethal injection procedure, which appears facially similar to the procedure considered in Baze, is unconstitutional. The defendant is not entitled to relief on this claim.

### J. Cumulative Effect of Errors

The defendant argues that he was denied a fundamentally fair trial as a result of the cumulative effect of the errors at his trial. Because we have determined that any errors were harmless, there is no "cumulative effect of errors" to consider. The defendant is not entitled to relief.

### K. Proportionality Review

Pursuant to Tennessee Code Annotated section 39-13-206(c)(1), we are required to review the application of the death penalty to determine whether:

(A) The sentence of death was imposed in any arbitrary fashion;

(B) The evidence supports the jury's finding of statutory aggravating circumstance or circumstances;

(C) The evidence supports the jury's finding that the aggravating circumstance or circumstances outweigh any mitigating circumstances; and

(D) The sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the nature of the crime and the defendant.

Tenn. Code Ann. § 39-13-206(c)(1).

### 1. Arbitrariness

Having thoroughly reviewed the record, we conclude that the sentence of death was not imposed in an arbitrary fashion.

### 2. Sufficiency of Statutory Aggravating Circumstances Found by the Jury

We have already reviewed the sufficiency of the evidence to support the aggravating circumstances found by the jury. We have determined that with respect to the murders of David Gordon and Jerry Hopper the proof was insufficient to support the application of the (i)(6) aggravating circumstance. Again, as to Renee Jordan, five aggravating circumstances are applicable: (i)(3), (i)(5), (i)(7), (i)(12), and (i)(13). As to Jerry Hopper, three aggravating circumstances are applicable: (i)(3), (i)(7), and (i)(12). As to David Gordon, three aggravating circumstances are applicable: (i)(5), (i)(7), and (i)(12).

### a. Invalidation of the (i)(6) factor

In reaching the determination of whether use of an invalid aggravating circumstance is harmless error beyond a reasonable doubt, our supreme court has concluded that:

> In order to guarantee the precision that individualized sentencing considerations demand and provide a principled explanation for our conclusion in each case, it is important, when conducting harmless error review, to completely examine the record for the presence of factors which potentially influence the sentence ultimately imposed. These include, but are not limited to, the number and strength of remaining valid aggravating circumstances, the prosecutor's argument at sentencing, the evidence admitted to establish the invalid aggravator, and the nature, quality and strength of mitigating evidence.

Howell, 868 S.W.2d at 260-61 (footnote omitted). Even in the absence of the (i)(6) factor, three aggravating factors are still applicable as to both the murder of Jerry Hopper and David Gordon. The number and strength of the remaining factors weigh in favor of harmless error. The nature, quality, and strength of the mitigation evidence is neutral on the issue of harmlessness of the error. After reviewing the entire record and applying the Howell analysis, we conclude that the error of charging and allowing the jury to consider the (i)(6) aggravating circumstance was harmless beyond a reasonable doubt.

### 3. Totality of Aggravating Factors Applied

With consideration of the evidence before the jury, we conclude that the evidence supports the jury's finding that the aggravating circumstances outweighed any mitigating circumstances beyond a reasonable doubt.

**4. Proportionality**

This court is required by Tennessee Code Annotated section 39-13-206(c)(1)(D) and the mandates of State v. Bland, 958 S.W.2d 651, 661-74 (Tenn. 1997), to consider whether the defendant's sentence of death is disproportionate to the penalty imposed in similar cases. State v. Godsey, 60 S.W.3d 759, 781-82 (Tenn. 2001). The comparative proportionality review "is designed to identify aberrant, arbitrary, or capricious sentencing." State v. Stout, 46 S.W.3d 689, 706 (Tenn. 2001). It does this by determining whether the death penalty in a given case is "'disproportionate to the punishment imposed on others convicted of the same crime.'" Bland, 958 S.W.2d at 662 (quoting Pulley v. Harris, 465 U.S. 37, 43, 104 S. Ct. 871, 876 (1984)). If a case is "'plainly lacking in circumstances consistent with those in cases where the death penalty has been imposed,' then the sentence is disproportionate." Stout, 46 S.W.3d at 706 (quoting Bland, 958 S.W.2d at 668).

In conducting our proportionality review, this court must compare the present case with cases involving similar defendants and similar crimes. Id.; see also Terry 46 S.W.3d at 163-64. We select comparison cases only from those cases in which a capital sentencing hearing was actually conducted to determine whether the sentence should be life imprisonment, life imprisonment without the possibility of parole, or death. State v. Carruthers, 35 S.W.3d 516, 570 (Tenn. 2000); see also Godsey, 60 S.W.3d at 783. This court begins with the presumption that the sentence of death is proportionate with the crime of first degree murder. Terry, 46 S.W.3d at 163 (citing Hall, 958 S.W.2d at 699). However, this presumption applies only if the sentencing procedures focus discretion on the "'particularized nature of the crime and the particularized characteristics of the individual defendant.'" Id. (quoting McCleskey v. Kemp, 481 U.S. 279, 308, 107 S. Ct. 1756, 1775 (1987) (quoting Gregg v. Georgia, 428 U.S. 153, 206, 96 S. Ct. 2909, 2940-41 (1976)).

In comparing this case to other cases in which the defendants were convicted of the same or similar crimes, this court looks "at the facts and circumstances of the crime, the characteristics of the defendant, and the aggravating and mitigating factors involved." Id. at 164. Regarding the circumstances of the crime itself, numerous factors are considered, including the following: (1) the means of death; (2) the manner of death; (3) the motivation for the killing; (4) the place of death; (5) the victim's age, physical condition, and psychological condition; (6) the absence or presence of provocation; (7) the absence or presence of premeditation; (8) the absence or presence of justification; and (9) the injury to and effect on non-decedent victims. Stout, 46 S.W.3d at 706; Terry, 46 S.W.3d at 164. Contemplated within the review are numerous other factors, including a defendant's: (1) prior criminal record; (2) age, race, and gender; (3) mental, emotional, or physical condition; (4) role in the murder; (5) cooperation with authorities; (6) level of remorse; (7) knowledge of the victim's helplessness; and (8) potential for rehabilitation. Id. In completing our review, we remain cognizant of the fact that "no two cases involve identical circumstances." Id. Thus, our function is not "to limit our comparison to those cases where a defendant's death sentence 'is perfectly symmetrical,' but only to 'identify and to invalidate the aberrant death sentence.'" Id. (quoting Bland, 958 S.W.2d at 665).

In the instant case, the facts at trial reveal that, on January 11, 2005, the defendant armed himself with numerous weapons and ammunition. He then drove to the TDOT garage where his estranged wife was employed. Once at the TDOT facility, the defendant walked to the crow's nest where his wife worked and surveyed the scene. The defendant called his wife's name and shot her in the leg. She fell to the floor and was shot at least three more times. Larry Taylor dove under a desk. The defendant walked over and shot Jerry Hopper twice in the right side of the abdomen and once in the right wrist. The defendant shot James Goff in the stomach, arm, leg, and neck. The defendant then shot Taylor twice in the leg. The defendant called out Renee's name and left the room.

On his way out, the defendant encountered Freddie Ellison, whom he knew, and told him to "back off." The defendant headed toward his truck where he was confronted by David Gordon. The defendant told Gordon to leave, and when he refused to do so, the defendant retrieved an assault rifle from his truck and opened fired on Gordon. Gordon fell to the ground. The defendant shot Gordon in the buttocks as he lay on the ground. Then, armed with the assault rifle, the defendant returned to the crow's nest.

In the crow's nest, Larry Taylor was tending to Jerry Hopper. Taylor rose and asked the defendant if he could leave. The defendant told him to go. The defendant then shot Renee Jordan again. He returned to his truck and left the TDOT garage.

The defendant was remorseful for his actions. His four children loved him and missed him. Numerous persons testified that the defendant would be a model prisoner. The defendant and his estranged wife had domestic problems. The defendant was diagnosed with dissociative disorder, major depressive disorder, generalized anxiety disorder, alcohol abuse, and borderline personality disorder. At the time of the crimes, the defendant had been drinking alcohol. The defendant had a stable work history and no prior criminal record. The defendant cooperated with law enforcement officers.

The sentence of death has been upheld in numerous cases in which the victim was the defendant's wife or girlfriend. See, e.g., State v. Faulkner, 154 S.W.3d 48 (Tenn. 2005) (defendant struck wife in head with iron skillet; (i)(2) aggravating circumstance); State v. Suttles, 30 S.W.3d 252 (Tenn. 2000) (defendant stabbed girlfriend in Taco Bell parking lot; (i)(2) and (i)(5) aggravating circumstances); State v. Keough, 18 S.W.3d 175 (Tenn. 2000) (defendant stabbed wife after argument in bar and left her to bleed to death in car; (i)(2) aggravator); State v. Hall, 8 S.W.3d 593 (Tenn. 1999) (after arguing with wife, defendant beat, strangled, and drowned her; (i)(5) aggravator); State v. Hall, 958 S.W.2d 679 (Tenn. 1997) (angry that girlfriend was going to leave him, defendant set fire to her car while she was inside; (i)(5) and (i)(7) (felony murder) aggravators); State v. Smith, 868 S.W.2d 561 (Tenn. 1993) (defendant stabbed, shot, and disemboweled wife; (i)(5) and (i)(12) (mass murder) aggravators); State v. Johnson, 743 S.W.2d 154 (Tenn. 1987) (defendant suffocated wife with plastic bag; (i)(2) and (i)(5) aggravators); State v. Miller, 674 S.W.2d 279 (Tenn. 1984), on remand, 771 S.W.2d 401 (Tenn. 1989) (defendant

beat girlfriend to death with fists and fire poker and then stabbed her numerous times; death penalty upheld under (i)(5) aggravating circumstance).

The sentence of death has been upheld in numerous cases in which the defendant committed mass murder. See, e.g., State v. Holton, 126 S.W.3d 845 (Tenn. 2004) (defendant shot and murdered his four children); State v. Carruthers, 35 S.W.3d 516 (Tenn. 2000) (imposing the death sentence based in part on the mass murder aggravating circumstance where the defendants shot two men, strangled the mother of one of the men, and buried all three victims alive); State v. Smith, 868 S.W.2d 561 (Tenn. 1993) (defendant shot and stabbed his wife and two stepsons).

The sentence of death has been upheld in numerous cases in which the defendant had little or no prior criminal history and/or the defendant exhibited psychological problems. See, e.g., State v. Burns, 979 S.W.2d 276 (Tenn. 1998) (death penalty upheld based on aggravating circumstances (i)(3) and (i)(6) where defendant shot victim several times during a robbery. Defendant presented mitigation proof that his father was a minister and that he had been active in the church. Proof also presented that defendant participated in religious services while in custody.); State v. Pike, 978 S.W.2d 904 (Tenn. 1998) (imposition of death penalty upheld based on aggravating circumstances (i)(5) and (i)(6) where defendant hand-selected victim prior to murder, lured victim to remote area, bludgeoned victim to death, mutilated body, and kept part of victim's skull as souvenir. Defendant had no prior criminal history and offered proof that she was under emotional or mental disturbance at time of the crime); Hall, 958 S.W.2d at 679 (death penalty upheld based on aggravating circumstances (i)(5) and (i)(7) where defendant doused girlfriend with gasoline, locked her in her vehicle and set her on fire. Defendant had no prior criminal history and offered mitigating proof of personality disorder.); State v. Bush, 942 S.W.2d 489 (Tenn. 1997) (death penalty affirmed based on aggravating circumstances (i)(5) and (i)(6) where defendant savagely beat and stabbed seventy-nine-year-old acquaintance to death. Defendant later boasted about the murder. Defendant offered evidence of mental disease and lack of prior criminal record.); Smith, 868 S.W.2d at 561 (death penalty upheld based on aggravating circumstances (i)(5), (i)(6), (i)(7) and (i)(12) where defendant found guilty of triple murder of estranged wife and her two children; defendant shot wife twice, slashed her throat, and stabbed her with knife and ice pick; older son shot three times, stabbed with ice pick and knife; and younger son had been shot and stabbed in the chest. Defendant offered psychological evidence of personality disorders.); State v. Zagorski, 701 S.W.2d 808 (Tenn. 1985) (death sentence upheld based on aggravating circumstances (i)(5) and (i)(7) where defendant presented himself as a South American mercenary to victim and the two men arranged a large purchase of marijuana, defendant later shot and killed victim, victim's throat was slashed evincing depravity of mind. Defendant had no prior record of violent criminal activity.); State v. Melson, 638 S.W.2d 342 (Tenn. 1982) (death penalty upheld based on aggravating circumstances (i)(5) and (i)(6) where defendant used hammer to repeatedly beat victim in head, victim had attempted to defend herself during ordeal, only motive was victim's discovery of defendant's theft, defendant had no significant prior history of criminal activity).

In completing our review, we need not conclude that this case is exactly like prior cases in every respect, nor must this court determine that this case is "more or less" like other death penalty cases. State v. Thomas, 158 S.W.3d 361, 383 (Tenn. 2005). Rather, this court need only identify aberrant death sentences by analyzing whether a capital case plainly lacks circumstances similar to those cases in the pool of cases in which a death sentence has been upheld. The penalty imposed by the jury in the present case is clearly not disproportionate to the penalty imposed for similar crimes.

## CONCLUSION

In accordance with the mandate of Tennessee Code Annotated section 39-13-206(c)(1) and the principles adopted in prior decisions of the Tennessee Supreme Court, we have considered the entire record in this cause and conclude that the sentence of death was not imposed arbitrarily. Moreover, we conclude that the erroneous application of the (i)(6) aggravating circumstance to the murders of Jerry Hopper and David Gordon was harmless. The evidence supports the jury's finding of the (i)(3), (i)(5), (i)(7), (i)(12), and (i)(13) statutory aggravating circumstances to the murder of Renee Jordan; the finding of the (i)(3), (i)(7), and (i)(12) statutory aggravating circumstances to the murder of Jerry Hopper; and the (i)(5), (i)(7), and (i)(12) statutory aggravating circumstances to the murder of David Gordon. Moreover, the evidence supports the jury's finding that the application of these enumerated aggravating circumstances outweighed any mitigating circumstances beyond a reasonable doubt. See Tenn. Code Ann. § 39-13-206(c)(1). Moreover, a comparative proportionality review, considering both "the nature of the crime and the defendant," convinces us that the sentences of death were neither excessive nor disproportionate to the penalty imposed in similar cases. Accordingly, we affirm the defendant's convictions for first degree murder and resulting sentences of death imposed by the trial court. We also affirm the defendant's convictions for attempted first degree murder and leaving the scene of the accident, as well as the resulting sentences.

_____
ALAN E. GLENN, JUDGE